(No. 87443.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. TONY J. DAMERON, Appellant.

*Opinion filed May 24, 2001.*

158

HARRISON, C.J., specially concurring.

Charles Schiedel, Deputy Defender, and Charles W. Hoffman, Assistant Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield, and David R. Akemann, State's Attorney, of St. Charles (Joel D. Bertocchi, Solicitor General, and William L. Browers and Colleen M. Griffin, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE FITZGERALD delivered the opinion of the court:

Following a jury trial in the Kane County circuit court, the defendant, Tony Dameron, was convicted of

first degree murder for killing his three-month-old daughter. The defendant waived his right to a sentencing-phase jury, and the trial court found him eligible for the death penalty. The court then found no mitigating circumstances sufficient to preclude the death penalty and sentenced the defendant to death. That sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a).

We affirm the defendant's conviction, but we reverse his death sentence and remand for a new sentencing hearing.

## BACKGROUND

Rachel Dameron was born on May 23, 1995. She lived with her mother, Cynthia Michniewicz, her one-year-old half-brother, Christopher Thornton, and her father, the defendant, in an Aurora apartment.

The defendant was unemployed, and he would baby-sit Christopher and Rachel while Michniewicz worked. On August 29, 1995, the defendant told Michniewicz he planned to attend a sobriety party at a local restaurant. He assured her that he would return around 9 p.m. to watch the children, so she could leave for work. When the defendant failed to arrive, Michniewicz left him a note saying she took the children to the Alejandros' house. Neighbors Deborah and David Alejandro (Deborah and David) occasionally cared for Christopher and Rachel.

The defendant did not attend a sobriety party. Instead, he walked to several Aurora bars where he drank beer and hard liquor from 5 p.m. to 1 a.m. When the defendant came home around 1:30 a.m., he saw Michniewicz's note and went to the Alejandros' house to retrieve the children. Deborah gave him Rachel. Christopher was sleeping, so he remained with the Alejandros.

At trial, the defendant testified that he brought

Rachel to their apartment, took her upstairs to bed, and went downstairs to shoot some heroin. When Rachel began crying, he went back upstairs to attend to her. As the defendant was taking her downstairs for a bottle, he dropped her. The defendant saw Rachel was not breathing; he told her to wake up and smacked her face to revive her. The next thing the defendant remembered was Michniewicz waking him later that morning.

Michniewicz returned to the apartment around 6:30 a.m. and found the defendant sleeping in bed. She woke him to ask about the children, and he told her that both children had stayed with the Alejandros overnight. Michniewicz got into bed to sleep for several hours. According to the defendant, he arose and went to the children's playroom. Inside the closet, he saw Rachel's lifeless body wrapped in a towel. The defendant put Rachel and the towel into plastic bags and then into a canvas duffel bag. He placed the duffel bag inside the closet and returned to bed. The defendant woke Michniewicz around 9:30 a.m. She asked if she should retrieve the children from the Alejandros; he said he would. Around 10:30 a.m., Michniewicz left to meet a friend from work, and the defendant visited the Alejandros to get Christopher. The defendant soon returned to the Alejandros and told David that Rachel had been kidnapped. David drove the defendant to a pay telephone to call the police.

An Aurora police officer was dispatched to the defendant's apartment around 11:30 a.m. The officer met the defendant, who reported that he had left Rachel in her car seat outside their apartment while he went inside to warm a bottle for her; when he returned, she was gone. Aurora police investigator Randall Place soon arrived at the defendant's apartment and spoke with the other police officer. Officer Place briefly surveyed the apartment, then asked the defendant to accompany him to the police station. The defendant agreed, locked the apartment, and left with Officer Place.

At the police station, the defendant gave Officer Place background information about his relationship with Michniewicz. The defendant gave his keys to the police, who returned to the apartment to search for Rachel. Inside the playroom closet, an officer found the canvas duffle bag. He opened it and found two white plastic bags. The officer felt a damp towel inside the second plastic bag. He looked inside and saw a baby's arm or leg. Around 2:30 p.m., Officer Place received a call from the defendant's apartment that Rachel was dead.

Officer Place gave *Miranda* warnings to the defendant and told him that Rachel had been found inside the apartment. When this statement elicited no reaction from the defendant, Officer Place asked the defendant to tell the police what he knew about Rachel. The defendant responded that he had killed Rachel—that he had dropped her on the stairs.

An autopsy revealed at least 37 types of injuries to Rachel's body, including blunt force trauma, skull and spine fractures, various other bone fractures, brain injury, contusions, strangulation marks, and lacerations of the liver and genital area. Rachel also had been exposed to water; her body had been washed. Rachel's head was deformed and discolored, and her brain was liquified. Blood and brain matter seeped from her right ear. Her vagina was dilated and stretched, and her vaginal and anal areas were torn. Not all of these injuries could be explained by falling down stairs; Rachel's injuries were not accidental. The forensic pathologist who performed the autopsy surmised that Rachel had been wielded by the legs and swung against a smooth, hard surface more than 10 times. This beating caused her death.

On September 18, 1998, the jury convicted the defendant of first degree murder. On September 21, 1998, the trial court found him eligible for the death penalty on

two grounds: the defendant murdered a person during an attempted aggravated criminal sexual assault (720 ILCS 5/9—1(b)(6)(c) (West 1996)); and the defendant murdered a person under 12 years of age, and the death resulted from "exceptionally brutal or heinous behavior indicative of wanton cruelty" (720 ILCS 5/9—1(b)(7) (West 1996)). On October 6, 1998, after a two-week aggravation/mitigation hearing, the court sentenced the defendant to death. This appeal followed. See 134 Ill. 2d R. 603.

## ANALYSIS

The defendant's appeal raises eight issues. These issues fall into three categories: guilt-phase issues, sentencing-phase issues, and issues attacking the constitutionality of the Illinois death penalty statute.

### 1. Guilt-Phase Issues

The defendant first contends he was denied a fair trial because, on direct examination by the State, Officer Place mentioned the defendant's post-*Miranda*-warning request for an attorney. On this legal issue, we review the record *de novo*. *People v. Daniels*, 187 Ill. 2d 301, 307 (1999).

During direct examination by the State, Officer Place testified that he gave *Miranda* warnings to the defendant. The State questioned Officer Place about his interview with the defendant:

"Q. What did he say to you at that time?

A. The second time I said Tony, you need to tell us what you know, and he said I killed her, I was drunk and I was taking her downstairs to fix her a bottle an [*sic*] I dropped her on the stairs.

Q. And in response to that question did you know she was dead what did he say?

A. Umm, at that point he said that she was dead, she was dead. Again, no eye contact, just stared straight ahead.

Q. Did you ask him whether or not he believed she was dead?

A. Umm, that question was asked, and he stated that she—that she in fact was dead.

\* \* \*

Q. And what did he say after that if anything?

A. Umm—Officer Snyder asked him: When you knew Rachel was dead, what did you do with the body? At that point he said: I can't remember. I just freaked out. I can't remember.

And then in turn I asked him after that: Was the amount of alcohol you drank was that a factor in you dropping Rachel on the stairs? And he stated: No, it wasn't. It was all me. And then he took a breath, he said: It was all my fault.

And then at that point he looked up, he did make eye contact with me, and he stated that he wanted to talk to an attorney, and I didn't ask him anymore questions."

Defense counsel objected and moved for a mistrial, and the State conceded Officer Place's statement was improper. The trial court denied the defendant's mistrial motion. Instead, the court barred the State from making further references to Officer Place's testimony about the defendant's request for an attorney or Place's testimony about the defendant's eye contact during the interview. The court also offered to give a curative jury instruction. After conferring with the defendant, defense counsel declined this offer, stating any instruction would only highlight the improper testimony and compound any error.

In *Doyle v. Ohio*, 426 U.S. 610, 619, 49 L. Ed. 2d 91, 98, 96 S. Ct. 2240, 2245 (1976), the United States Supreme Court held that the prosecution generally cannot use a defendant's post-*Miranda*-warning silence for impeachment purposes without violating due process. *People v. Pegram*, 124 Ill. 2d 166, 176 (1988). The *Doyle* rule also applies to a defendant's post-*Miranda*-warning request for an attorney. See *Wainwright v. Greenfield*, 474 U.S. 284, 295 n.13, 88 L. Ed. 2d 623, 632 n.13, 106 S.

Ct. 634, 640 n.13 (1986); *People v. Lucas*, 132 Ill. 2d 399, 432 (1989).

A violation of the *Doyle* rule, however, may constitute harmless error. *People v. Miller*, 96 Ill. 2d 385, 395 (1983). We have recognized at least five factors for a court to consider in determining whether a *Doyle* violation was harmless beyond a reasonable doubt: (1) the party who elicited the testimony about the defendant's silence; (2) the intensity and frequency of the references to the defendant's silence; (3) the use that the prosecution made of the defendant's silence; (4) the trial court's opportunity to grant a mistrial motion or to give a curative jury instruction; and (5) the quantum of other evidence proving the defendant's guilt. *People v. Patterson*, 154 Ill. 2d 414, 467-68 (1992); *People v. Frieberg*, 147 Ill. 2d 326, 354-55 (1992); *Lucas*, 132 Ill. 2d at 432-33; *Miller*, 96 Ill. 2d at 396; accord *People v. Warren*, 217 Ill. App. 3d 778, 783 (1991) (enumerating factors).

In *Miller*, the State on cross-examination asked the defendant why he failed to tell his exculpatory story to the police after his arrest. The defense objected and moved for a mistrial. The trial court sustained the objection, denied the mistrial motion, and instructed the jury to ignore the State's question "for the time being."

We held that the *Doyle* violation was harmless beyond a reasonable doubt. *Miller*, 96 Ill. 2d at 396. Although the State asked the question, it was a brief reference to the defendant's silence which the State never revisited. *Miller*, 96 Ill. 2d at 396. Further, the court issued a prompt curative instruction, and the record contained sufficient admissible evidence of the defendant's guilt. *Miller*, 96 Ill. 2d at 396.

In *Lucas*, the State asked the defendant's mother about conversations she had with the defendant, and she answered, "The investigators had told me that [the defendant] had asked for a lawyer." The defense objected

and moved for a mistrial. The court sustained the objection, but denied the mistrial motion. The court admonished the defendant's mother not to make further references to the defendant's silence, and the court accepted a defense request not to give a curative instruction to avoid drawing the jury's attention to the testimony.

We again held that the *Doyle* violation was harmless beyond a reasonable doubt. *Lucas*, 132 Ill. 2d at 433. The defendant's mother volunteered the brief comment, and the State made no further references to the defendant's request for an attorney. *Lucas*, 132 Ill. 2d at 432-33. The court sustained a defense objection to the comment, the defense declined the court's offer to give a curative instruction, and the record contained overwhelming evidence of the defendant's guilt. *Lucas*, 132 Ill. 2d at 433.

In *Patterson*, a police officer, on direct examination by the State, testified that the defendant said he understood his *Miranda* warnings. The police officer stated that he next asked the defendant, "Do you wish to answer questions, at this time?" The assistant State's Attorney then asked what the defendant replied. When the police officer answered "No," the defense moved for a mistrial. The trial court found the error was harmless and curable with a jury instruction. The court told the jury to disregard the comment, and the State made no further mention of the defendant's post-arrest silence.

We agreed with the trial court: the *Doyle* violation was harmless beyond a reasonable doubt. *Patterson*, 154 Ill. 2d at 468. Although the State elicited the police officer's testimony, the brief statement during a lengthy trial was not egregious, and the curative jury instruction was clear. *Patterson*, 154 Ill. 2d at 467. The prosecution did not rely on the defendant's silence, and the admissible evidence was sufficient to prove his guilt. *Patterson*, 154 Ill. 2d at 467.

Here, the State elicited Officer Place's testimony on

the defendant's request for an attorney, but the statement was so brief and isolated that defense counsel asked the trial court not to highlight the improper testimony by giving a curative jury instruction. The court barred further references to this statement and to Place's comments about the defendant's eye contact, and the State never returned to this testimony. Finally, the State presented strong evidence of the defendant's guilt. The *Doyle* violation was harmless beyond a reasonable doubt.

The defendant next contends he was denied a fair trial because the involuntary manslaughter jury instructions told the jury that the State bore the burden to prove him guilty of that offense, but the State urged the jury to find him not guilty of manslaughter. We already have rejected this argument (*People v. Oaks*, 169 Ill. 2d 409, 463 (1996); *Lucas*, 132 Ill. 2d at 442-43), and the defendant offers no reason for us to reconsider our earlier holdings. Here, the instructions properly stated the burden of proof and did not prevent the jury from considering evidence which would have allowed an involuntary manslaughter conviction. We affirm his first degree murder conviction.

## 2. Sentencing-Phase Issues

The defendant first contends his sentencing jury waiver was invalid. We review this legal issue *de novo*. *Daniels*, 187 Ill. 2d at 307.

In June 1997, the defendant filed a *pro se* "Motion for instruction that the jury is to presume that if sentenced to life, the defendant will spend the remainder of his natural life in prison." This motion was based upon our holding in *People v. Gacho*, 122 Ill. 2d 221, 262 (1988). "[A] *Gacho* instruction is required in a capital sentencing hearing where a sentence of natural life in prison is the only available alternative to the death penalty." *People v. Simms*, 192 Ill. 2d 348, 407 (2000); accord *People v. Macri*, 185 Ill. 2d 1, 73-74 (1998); see Il-

linois Pattern Jury Instructions, Criminal, No. 7C.05 (3d ed. 1992).

Public Act 89—203, effective on July 21, 1995, rewrote section 5—8—1(a)(1)(c)(ii) of the Unified Code of Corrections. After this amendment, section 5—8—1(a)(1)(c)(ii) of the Code provided:

"(a) *** [A] sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations:

(1) for first degree murder,

\* \* \*

(c) the court shall sentence the defendant to a term of natural life imprisonment when the death penalty is not imposed if the defendant,

\*\*\*

(ii) is a person who, at the time of the commission of the murder, had attained the age of 17 or more and is found guilty of murdering an individual under 12 years of age ***." 730 ILCS 5/5—8—1(a)(1)(c)(ii) (West 1996).

This section applied to the defendant. At the time he was sentenced, the defendant could receive only life imprisonment or death.

In the hearing on the defendant's *pro se* motion, however, defense counsel erroneously stated that this court had held Public Act 89—203, and therefore section 5—8—1(a)(1)(c)(ii), violated the single subject rule of the Illinois Constitution. Accordingly, the defense believed the defendant was not entitled to a *Gacho* instruction: "I would have asked for such an instruction, *** but it's not a mandatory situation now, and so certainly can't tell the jury if he doesn't get the death penalty he's going to get life, because that may not be the case." The State agreed that this law was unconstitutional and that the defendant was not entitled to a *Gacho* instruction. The court spoke to the defendant about "well-settled principles" of informing the jury about sentencing alternatives only when a life sentence is the only alternative to

the death penalty. Defense counsel withdrew the motion; the defendant assented.[1]

On several subsequent court dates, the court and the defense discussed whether the defendant would waive a sentencing jury. That question was left unresolved. In August 1998, the court indicated it would limit the defendant's peremptory challenges from 20 to 14. On August 25, 1998, shortly before the trial date, the defendant waived his right to a sentencing-phase jury.[2]

"The right to a sentencing jury in a capital case is a statutory, not a constitutional, right." *People v. Erickson*, 117 Ill. 2d 271, 289 (1987); see 720 ILCS 5/9—1(d) (West 1996). Like a guilt-phase jury waiver, a sentencing-phase jury waiver must be knowing and intelligent. *People v. Brown*, 169 Ill. 2d 132, 156 (1996); *People v. Strickland*, 154 Ill. 2d 489, 517 (1992). Whether a defendant's waiver of a sentencing jury is knowing and intelligent depends upon the facts and circumstances of each case. *People v. St. Pierre*, 146 Ill. 2d 494, 508 (1992).

---

[1]The confusion surrounding the defendant's *Gacho* motion resulted from a misreading of our opinion in *Johnson v. Edgar*, 176 Ill. 2d 499 (1997), which held Public Act 89—428 violated the single subject rule of the Illinois Constitution. Public Act 89—428 added section 5—8—1(a)(1)(c)(vi) to the code. This provision applied to defendants under age 17, "found guilty of murdering a person under 12 years of age and the murder is committed during the course of aggravated criminal sexual assault, criminal sexual assault, or aggravated kidnaping." 730 ILCS 5/5—8—1(a)(1)(c)(vi) (West 1996). This provision did not apply to the defendant because he was more than 17 years old when Rachel was killed.

Ultimately, after the defendant's sentencing proceedings, we held that Public Act 89—203 also violated the single subject rule. *People v. Wooters*, 188 Ill. 2d 500 (1999).

[2]The defendant received a lengthy waiver admonition from a different judge than the judge who ruled on the jury instruction request, limited the defendant's peremptory challenges, and ultimately tried the case. The defendant does not contend this admonition was inadequate.

The defendant contends his decision to waive a sentencing jury was not knowing and intelligent. The defendant claims that he would not have waived a sentencing jury if he had received correct advice from the trial court and, consequently, the *Gacho* instruction he requested. The State, however, argues that the *Gacho*-instruction ruling did not affect the defendant's waiver decision because he waived a jury only after the court limited his peremptory challenges.

The State refers us to *People v. Maxwell*, 148 Ill. 2d 116 (1992). In *Maxwell*, the trial court ruled that evidence of prior offenses committed by the defendant would be admissible at trial. Defense counsel advised the trial court that the defendant wished to waive a sentencing jury for three reasons: first, defense counsel believed the judge might be more lenient than a sentencing jury; second, defense counsel wanted to avoid death-qualifying the guilt-phase jury; and third, defense counsel wanted to avoid submitting the sentencing decision to a jury aware of the defendant's criminal record. Defense counsel incorrectly believed uncharged offenses were inadmissible in an aggravation/mitigation hearing; she was unaware that other-crimes evidence was admissible at sentencing. On direct appeal to this court, the defendant contended his jury waiver was invalid because he received ineffective assistance of counsel.

We acknowledged defense counsel's error, but we held this error was irrelevant to the defendant's waiver decision. *Maxwell*, 148 Ill. 2d at 145. The defendant's jury waiver, whether or not it was premised on a misunderstanding of evidence law, accomplished defense counsel's strategic goal: preventing the sentencing jury from hearing about the defendant's criminal record. *Maxwell*, 148 Ill. 2d at 144-45. We concluded that counsel's error was not professionally unreasonable and that the defendant suffered no prejudice: "[D]efense counsel would have of-

fered the same recommendation if she had known that the evidence of the defendant's other crimes would later be admissible at the sentencing hearing." *Maxwell*, 148 Ill. 2d at 145; accord *People v. Maxwell*, 173 Ill. 2d 102, 116 (1996) (post-conviction petition appeal).

*Maxwell* is distinguishable. The legal error in this case, unlike the error in *Maxwell*, precluded the defendant's strategic goal. The defendant wanted a sentencing jury instructed that its options were limited to a life sentence or a death sentence. More importantly, unlike the record in *Maxwell*, the record here contains no independent reasons for the defendant's sentencing jury waiver. The defendant filed his own *Gacho*-instruction motion, and defense counsel stated that he would have asked for a *Gacho* instruction if he thought the defendant was entitled to one. After the defendant received erroneous advice and withdrew his *pro se* motion, he faced two choices: sentencing by the judge or sentencing by a jury, which would not receive a *Gacho* instruction limiting its options to life or death. When the court trimmed the defendant's peremptory challenges, he soon chose to waive a sentencing jury. We reasonably can conclude an incorrect *Gacho*-instruction ruling irreparably tainted the defendant's waiver decision.

Finally, the legal error here, unlike the error in *Maxwell*, was not limited to the defense. Every legal professional in this case erroneously advised the defendant that he was not entitled to a *Gacho* instruction. We have held a sentencing jury waiver may be invalid when a defendant receives erroneous legal advice from the trial court. *Brown*, 169 Ill. 2d at 162 ("the State's argument does not address or mitigate the fact that the trial judge misstated the law and misled the defendant into believing that a sentencing jury waiver was required if he wished to waive a jury for trial"); see *People v. Henderson*, 142 Ill. 2d 258, 335 (1990) ("The record shows that

defendant made the waiver decision after talking with his attorney *** and before talking to the judge; so defendant's waiver decision was not based, even in part, on the judge's misstatement of law"). Here, defense counsel's erroneous advice was consistent with that of the trial court. The defendant's sentencing jury waiver was invalid.

Although our resolution of the jury waiver issue is sufficient to reverse the defendant's death sentence and remand for a new sentencing hearing, we turn to the defendant's second sentencing contention because of the importance of the issue involved. The defendant also contends he was denied a fair sentencing hearing because the trial judge relied extensively upon evidence outside the record in deciding to impose the death penalty. The defendant specifies two improper sources: a social science book (F. Butterfield, All God's Children: The Bosket Family and the American Tradition of Violence (1995)) and a transcript of sentencing comments made by the judge's father in a 1966 murder trial.

Initially, we note the State argues the defendant forfeited review of this issue by failing to object at the time the court imposed its sentence. But "[a]pplication of the waiver rule *** is less rigid where the basis for the objection is the circuit judge's conduct." *People v. Davis*, 185 Ill. 2d 317, 343 (1998); see *People v. Saldivar*, 113 Ill. 2d 256, 266 (1986) ("To preserve any error of the court made at that time [sentencing], it was not necessary for [defense] counsel to interrupt the judge and point out that he was considering the wrong factors in aggravation"). Again, we review this legal issue *de novo. Daniels*, 187 Ill. 2d at 307.

"A determination made by the trial judge based upon a private investigation by the court or based upon private knowledge of the court, untested by cross-examination, or any of the rules of evidence constitutes a denial of due

process of law." *People v. Wallenberg*, 24 Ill. 2d 350, 354 (1962); accord *People v. Thunberg*, 412 Ill. 565, 567 (1952); *People v. McMiller*, 410 Ill. 338, 342 (1951).

We turn to the trial court's sentencing comments regarding the social science book:

"As I listened to the evidence in this case, particularly the evidence in aggravation and mitigation, which took the better part of two weeks, I could not help but feel that I've heard this case before. And I went to my library and retrieved my copy of a book that was published in the year 1995 entitled *All God's Children, the Bosket Family and The American Tradition of Violence.*

In this case I believe I heard evidence going back three generations in the family of Tony Dameron. The author of the book which I mentioned is an individual by the name of Fox Butterfield, who was, at least at the time this book was published, an editor of the *New York Times.* This is a nonfiction book. It deals with a family known as the Boskets from about the time of the American Revolution until the publication of this book in 1995. I feel compelled to make some reference to observations which the author makes in the epilogue portion of the book. The items to which I wish to make reference in my initial thinking turned out to be quite lengthy, so I have tried to narrow that down.

The significance of this volume to the case at hand is because of the striking resemblance that the family from which the defendant comes bears to the family of a person known by the name of Willie Bosket. And Mr. Butterfield points out the following:

'In the closing years of the twentieth century, the number of young boys committing murder has reached epidemic proportions. Between 1985 and 1993 homicides by 15- to 19-year-old males in the United States jumped more than 150 percent, almost all of them involving guns. Willie Bosket is no longer an anomaly. Stories like his have become all too familiar as the staple of nightly television news.

'In the face of this plague of violence, it is easy to despair. The politicians, reading from the public

opinion polls, have a ready answer: more prisons, tough three-strikes-and-you're-out jail sentences, and laws to try juveniles as adults in criminal courts. Some state legislators have boasted that they have "abolished childhood" by providing for children as young as age six to be sent to adult court. By 1995, there were 1.5 million people incarcerated in state and federal prisons and in local jails around the nation. Another 100,000 youths were confined in juvenile institutions. These numbers have tripled in the past two decades.'

In talking about prisons he observes:

'Prisons have another disadvantage—they are a heavy financial burden. In 1995 the cost of running the nation's prison system—along with probation and parole departments—is running close to fifty billion dollars a year, up from a mere four billion dollars in 1975. Keeping a juvenile in New York's division for Youth for a year now costs $75,000; you could send three students to Harvard for the same money. In many states, new laws mandating longer prison terms have forced local governments into prison construction programs that are the fastest rising item in their budget. California has reduced funding for its once excellent state college and university system to help pay for its growing number of prisons.

'Boiled down to its core, everything criminologists have learned about crime in recent research is that most adolescents who become delinquent, and the overwhelming majority of adults who commit violent crimes, started very young. They were impulsive, aggressive, irritable children who would not obey their parents, bullied their neighbors, and acted out when they got to school. By first and second grade, teachers can usually identify them in class. They find it difficult to learn, and fall behind in school. Because they are accustomed to getting their way by physical force, they see no reason to change. They actually like the way they act, and this makes it increasingly difficult to reverse their antisocial proclivities.'

And the last reference I make to this treatise is as follows:

'In certain ways the rest of the globe has come to look more like America since the worldwide upsurge in crime in the 1960s. British homes are now more likely to be burgled than American ones. Cars in France are stolen more frequently than in the United States. But in homicide, we retain our longtime lead. In 1991, the most recent year for which figures are available, young men between 15 and 24 in the United States were murdered at the rate of 37.2 per 100,000. That is almost ten times higher than the next closest industrialized country, Italy, and 60 times greater than the homicide rate among the same age group in England. This is not, as some people might suppose, merely a disparity created by the racial composition in our inner cities. When minorities are factored out, America still has a disturbingly disproportionate murder rate.

'In the past few years, perhaps guided by the sudden popularity of the term "dissing" in movies and rap music, sociologists and psychologists have begun to recognize the impact of the notion of disrespect. New curriculums designed to teach alternate, more peaceful ways to settle conflicts, have appeared in thousands of classrooms across the country. Think of the consequences before you act, is their message. You don't have to use your fists, or a gun, when someone insults you. Whether these modern-day civics lessons are effective is unclear. They may reduce pushing in the cafeteria line; by themselves, they may not stop shooting on the street corner.' "

The State characterizes the judge's comments as a mere prelude to his sentence. The State relies upon *People v. Griffith*, 158 Ill. 2d 476 (1994). In *Griffith*, the trial judge, in sentencing the defendant, noted that an inmate convicted of murder and sentenced to natural life imprisonment would return to the general prison population after one year of disciplinary segregation. The court said that only the death penalty would deter an inmate already serving a life sentence from killing fellow inmates and prison officials.

We held: "These comments were but one aspect of

the judge's articulation of his rationale for imposition of the death sentence and were not error. In rendering a sentence, a trial judge is presumed to have relied upon only competent and reliable evidence." *Griffith*, 158 Ill. 2d at 497. We concluded the defendant did not overcome this presumption because he offered no evidence the judge's "rhetorical comments" served as an improper basis for the death penalty. *Griffith*, 158 Ill. 2d at 497.

The defendant urges us to consider *People v. Rivers*, 410 Ill. 410 (1951). In *Rivers*, two teenage girls were indicted for first degree murder. At the close of the State's case, the defendants moved for a directed verdict. The trial judge expressed doubt about the State's case and asked the prosecution to reindict the girls for conspiracy to commit murder. The judge continued the case for two months. When the case resumed, the judge displayed a markedly changed attitude. Without opening the case for additional evidence, he *sua sponte* interrogated the girls' fathers about whether the guns the girls used were registered. The judge asserted this case involved "a cold-blooded, premeditated killing" and stated, "Murders by youngsters are on the rampage everywhere. Almost daily we read of atrocious killings by juveniles, with some new, shocking angle to the tragedy. Teen-age murderers have been pampered too often, to the point of national alarm and disgust." The judge added, "Society cannot long endure such appalling conditions. It makes law enforcement extremely difficult. According to the State's Attorney, *** there are over 400,000 unlicensed, and unregistered guns in Chicago, most of which are exposed to potential murderers and youngsters." *Rivers*, 410 Ill. at 415-16. The girls were convicted of murder and sentenced to 14 years' imprisonment. In addressing defense counsel about arguing a new trial motion, the judge said, "I don't think you can add to what has been said to me over these weeks [of recess]." *Rivers*, 410 Ill. at 418.

We reversed the convictions and remanded for a new trial. *Rivers*, 410 Ill. at 419. We observed:

> "[T]he deliberations of the trial judge are limited to the exhibits offered and admitted in evidence and the record made before him in open court. Any private investigation by the court, either during the trial of the cause or while the motion for new trial is pending, constitutes a denial to the defendant of the constitutional guarantee of due process of law. [Citation.] The defendant in any criminal proceeding has an inherent and constitutional right that all proceedings against him shall be open and notorious, and in his presence, and any inquiry or any acquisition of information or evidence outside of open court and outside of the presence of the defendant is prejudicial error. *** He has a right to rely upon his constitutional guarantee that nothing shall be considered against him except the competent evidence introduced in open court, in his presence, by the witnesses who confront him." *Rivers*, 410 Ill. at 416-17.

The record showed "some private investigation" during the two-month recess. *Rivers*, 410 Ill. at 418. The defendants' constitutional rights were violated, regardless of whether this investigation had an innocent purpose or yielded benign results. *Rivers*, 410 Ill. at 419.

The comments in this case more closely resemble those in *Rivers* than those in *Griffith*. In *Griffith*, the judge briefly alluded to his knowledge of Illinois' penal system. Like the judge in *Rivers*, the judge in the defendant's case spoke at length about social science statistics and vague generalizations about crime he uncovered through his own investigation. An excerpt from the Butterfield book recited by the judge also conflicts with evidence in this case.

According to the judge, Butterfield wrote that unnamed criminologists have learned adults who commit violent crimes begin as bullies: "Because they are accustomed to getting their way by physical force, they see no reason to change. They actually like the way they act,

and this makes it increasingly difficult to reverse their antisocial proclivities." All God's Children, at 327.

Dr. Eric Ostrov, the defendant's forensic psychology expert, was described by the trial court as "well qualified in his field of expertise." Dr. Ostrov testified in the aggravation/mitigation hearing that the defendant suffered from two personality disorders: borderline personality disorder and antisocial personality disorder. Dr. Ostrov opined the defendant was not a psychopath, "a person who has no empathy or feelings for another individual, cold, calculating, only out for their ownselves, egotistical, destructive if they need to be." Instead, according to Dr. Ostrov, the defendant did care for people and felt genuine remorse about his violence toward Rachel and its consequences for others. In a stipulated affidavit, Dr. Ostrov added the symptoms of both borderline and antisocial personality disorders dissipate around age 40.

We next turn to the judge's reference to sentencing comments made by his father, a Kane County circuit judge, in a 1966 murder case:

"And in thinking about this case, I also recalled in the summer of 1966 my father before me was called upon to pass sentence in a case which bears substantial resemblance to this case. At that time I was a lawyer of about five years' experience—I'll take that back, that was before I even became a lawyer. But I remembered how he anguished at home over what he should do. And what he did in that case is of no consequence here today, but what he said in relationship to the circumstances in which he found himself at that time applies to the circumstances which I find myself in at this time.

And on July 8th of 1966 in the case of the People of the State of Illinois versus Veronica Crews, case number 66—904, he said in part as follows:

'I take it that it goes without saying that when any man or woman is elected to the bench no one forces them to that position, no one makes them accept that position.

'When one human being accepts that position and signs his oath of office and raises his hands to follow the laws of the constitution of the State of Illinois, he or she alone assumes those burdens, that he or she, the same as I, is the only person responsible for the decisions that he or she gives, the sentences that are handed out. And I am the only person who must live with my own conscience.'

He also stated: 'I am here to carry out the laws as I find them as fairly and impartially as I know how within the limits of my own capabilities, but I cannot in my experience recall to mind a more horrible death than is witnessed in this case.'

I can say the same thing in this case, particularly when it comes to the manner in which Rachel Renee Dameron died."

By recalling his father's anguish over imposing a death sentence and by comparing the brutality of the 1966 case to that in the defendant's case, the judge aligned himself with his father in imposing the death penalty. Again, the judge looked outside the record.[3]

In the hearing on the defendant's post-trial motion, the judge said, "[N]othing contained in that [Butterfield] volume or any of the other dozens of volumns [*sic*] that I have read over the years dealing with matters of criminal jurisprudence \*\*\* controlled any portion of my decision in this case." A judge need not give controlling weight to the improper evidence to trigger our reversal; even giving "very little weight" is improper. *People v. Simms*, 121 Ill. 2d 259, 274 (1988) (victim impact statements). Here, the judge felt compelled to comment upon

---

[3]In *People v. Crews*, 38 Ill. 2d 331 (1967), we reversed the defendant's conviction and remanded for resentencing because the trial court relied on unreliable information in imposing the death penalty. The trial court subsequently reimposed the death penalty. In a second appeal, we reversed her sentence and imposed a 20- to 35-year sentence because the trial court's sentence was excessive. *People v. Crews*, 42 Ill. 2d 60, 66 (1969).

the Butterfield book and acknowledged its significance to the defendant's case. He also noted the substantial resemblance between the defendant's case and the 1966 case over which his father presided. Additionally, the judge's comments about and quotations from the Butterfield book, together with his references to his father's comments, comprise nearly half of his total sentencing comments. The judge's references to these sources show that he gave some weight to them.

In *Rivers*, we stated: "When a defendant in a criminal case waives trial by jury and submits his rights and liberty to a judge, that judge is in the identical position of the jury and all the recognized rules for the protection of the defendant's rights apply with equal force. [Citation.] It is axiomatic that any unauthorized information reaching the jury is prejudicial error." *Rivers*, 410 Ill. at 419. We reach the same conclusion here. "[T]he trial court may search within reasonable bounds for facts in an inquiry relative to aggravation and mitigation. Here, the trial court's search passed such bounds and was improper." *Crews*, 38 Ill. 2d at 339. Our resolution of this issue alone is sufficient to reverse the defendant's death sentence and remand for a new sentencing hearing.

The trial judge sought alternative avenues of information in his effort to reach the correct result. Unfortunately, that effort led to the error here. Accordingly, in order to remove any suggestion of unfairness, this case should be assigned to a different judge on remand.

3. Constitutionality of the Illinois Death Penalty Statute

The defendant challenges the constitutionality of the Illinois death penalty statute. The defendant contends the statute is unconstitutional because it places the mitigating evidence burden of proof on the capital defendant; because it allows the sentencer to weigh a vague aggravating factor, "any other reason"; and because it

inevitably will allow an innocent person to be executed. We repeatedly have rejected these arguments, recently in *People v. Hall*, 194 Ill. 2d 305, 357-59 (2000). Accord *People v. Bull*, 185 Ill. 2d 179, 220 (1998). We adhere to our earlier decisions.

## CONCLUSION

For the reasons we have discussed, we affirm the defendant's first degree murder conviction, vacate his death sentence, and remand for a new sentencing hearing.

*Conviction affirmed;*
*death sentence vacated;*
*cause remanded.*

CHIEF JUSTICE HARRISON, specially concurring:

I agree with the majority that Dameron's murder conviction should not be disturbed, but that we should vacate his sentence of death and remand the cause to the circuit court for a new sentencing hearing. I write separately because I would further hold that the State should not be permitted to seek the death penalty on remand. Contrary to my colleagues, I believe that Dameron's challenge to this state's death penalty law is meritorious. For the reasons set forth in my partial concurrence and partial dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), the Illinois death penalty law violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). It is therefore void and unenforceable.

Because the death penalty law is unconstitutional, Dameron must now be sentenced to a term of imprisonment. 720 ILCS 5/9—1(j) (West 1996). At the time Dameron murdered Rachel, Public Act 89—203 had just taken effect. Under that statute, a defendant who had attained the age of 17 and been found guilty of murdering

an individual under 12 years of age had to be given a term of imprisonment of natural life when the death penalty was not imposed. 730 ILCS 5/5—8—1(a)(1)(c)(ii) (West 1996). As the majority points out, however, Public Act 89—203 was invalidated by our court in *People v. Wooters*, 188 Ill. 2d 500 (1999), on the grounds that it violated the single subject clause of the Illinois Constitution. Accordingly, on remand, Dameron must be resentenced under the unamended provisions of the Unified Code of Corrections as they existed prior to the effective date of Public Act 89—203. See *People v. Coleman*, 311 Ill. App. 3d 467, 477 (2000).