NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241055-U

NO. 4-24-1055

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 20, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| ROBERT E. DODD, | ) | No. 23CF629 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | William A. Yoder, |
| | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices Grischow and Cavanagh concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The appellate court affirmed defendant's convictions for three counts of unlawful delivery of methamphetamine and the concurrent 20-year prison sentences where defendant failed to establish the trial court considered an improper aggravating sentencing factor.

¶ 2     Following a jury trial, defendant, Robert E. Dodd, was convicted of three counts of unlawful delivery of methamphetamine (720 ILCS 646/55(a)(1) (West 2022)). The trial court sentenced defendant to concurrent 20-year prison terms on each count. Defendant appeals, arguing the court improperly considered general societal harm as an aggravating sentencing factor. We affirm.

¶ 3                          I. BACKGROUND

¶ 4     On June 28, 2023, the State charged defendant with five counts of delivery of methamphetamine stemming from his providing it to a confidential police informant on three

occasions. Specifically, the State alleged the following. On May 1, 2023, defendant delivered more than 5 but less than 15 grams of a substance containing methamphetamine (count I). On May 8, 2023, defendant delivered more than 15 but less than 100 grams of a substance containing methamphetamine (count II) and more than 5 but less than 15 grams of a substance containing methamphetamine (count III). Finally, on May 31, 2023, defendant delivered more than 5 but less than 15 grams of a substance containing methamphetamine (count IV) and less than 5 grams of a substance containing methamphetamine (count V). Prior to trial, the State dismissed counts III and V and renumbered count IV to count III.

¶ 5        On October 19, 2023, the trial court granted defendant's request to proceed *pro se*. On November 13, 2023, defendant's trial commenced. The evidence included testimony, videos of the three drug transactions, a video of defendant's postarrest interview, and an audio recording of a phone call defendant made from jail. The evidence established the following.

¶ 6        Anthony Fairchild, a confidential informant, informed Bloomington Police Officer Alex Freshour that defendant was selling drugs in the Bloomington area. As a result, Freshour initiated an investigation of defendant that involved, with the assistance of Fairchild, three "controlled buy transactions" of methamphetamine from defendant throughout May 2023.

¶ 7        The first controlled buy occurred on May 1, 2023. On that date, Fairchild drove to a parking lot near defendant's residence and met with Freshour, Illinois State Police Inspector Austin Quinn, and Bloomington Police Officer Stephen Brown. When Fairchild arrived, he was informed he would be surveilled from afar as he drove to defendant's home and purchased methamphetamine from him. Freshour and Quinn searched Fairchild and his vehicle to make certain he had no narcotics or contraband prior to the purchase, thereby "ensur[ing] the integrity of the investigation." After Freshour and Quinn confirmed Fairchild had no contraband, they

provided him with $300 from the Illinois State Police's fund and affixed to his shirt a camera that looked like a shirt button to record his interaction with defendant. Fairchild then drove to defendant's home. When he arrived, he went inside the residence and met with defendant in a bedroom. Fairchild testified defendant took a scale out of a dresser and began to weigh a substance. Fairchild then exchanged money with defendant for the substance, which was packaged in a clear plastic bag. Thereafter, Fairchild returned to his vehicle and drove back to the parking lot to meet with Freshour and Quinn. Fairchild gave them the substance he obtained, and Freshour and Quinn retrieved their camera and searched Fairchild to ensure he did not keep any money or narcotics.

¶ 8 The second controlled buy occurred on May 8, 2023. Freshour and Quinn met with Fairchild and briefed him on the plan, which involved Fairchild driving to Peoria with defendant to obtain methamphetamine from another individual, a portion of which Fairchild would then purchase. After Freshour and Quinn confirmed Fairchild had no contraband on his person or in his vehicle, they gave him $300 and installed a camera that looked like a cell phone charger in the cigarette lighter of his vehicle. Fairchild then picked up defendant from his home and drove to Peoria. Freshour followed in an undercover vehicle to conduct surveillance. Fairchild testified when they arrived in Peoria, he parked at a Dollar Tree and gave defendant money. Defendant then exited the vehicle and met with a female individual in a black car before returning to Fairchild's vehicle. According to Fairchild, because the female individual needed to "pick up the methamphetamine" defendant requested, they left and gambled at a slot machine for 30 minutes to an hour. Eventually, the female individual contacted defendant to let him know he could "retrieve the purchase." Defendant met with the individual and completed the transaction while Fairchild waited in his vehicle. After defendant entered Fairchild's vehicle, they drove back to defendant's residence. When they arrived, they went to the dresser in the bedroom. Defendant

weighed one ounce of the substance and gave it to Fairchild. Fairchild then left the residence and met with Freshour, who took the substance, searched Fairchild and the vehicle, and retrieved the camera. Freshour conducted a preliminary field test of the substance, which was positive for the presence of methamphetamine.

¶ 9        The third controlled buy took place on May 31, 2023. Once again, Freshour and Quinn met with Fairchild at a location near defendant's residence and briefed him about the plan, which was to have him purchase one ounce of methamphetamine from defendant. After Freshour and Quinn confirmed Fairchild had no contraband on his person or in his vehicle, they outfitted him with a camera that looked like a shirt button and gave him money for the purchase. Fairchild then drove to defendant's residence. He testified he met with defendant in a bedroom and gave defendant $180. Defendant then weighed out a substance and gave it to Fairchild. Thereafter, Fairchild left and reconvened with Freshour. Upon meeting, Freshour searched Fairchild and took the substance from him. Freshour testified he conducted a preliminary field test soon thereafter, which showed the substance was positive for the presence of methamphetamine.

¶ 10        On June 27, 2023, defendant was arrested and interviewed by Freshour and Quinn at the Bloomington Police Department. After acknowledging he understood his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), defendant denied selling methamphetamine for money from his home but admitted he gave people methamphetamine for "merchandise" or to get people to leave him alone.

¶ 11        Freshour testified, on June 28, 2023, defendant made a phone call from jail, which he listened to, as his duties included monitoring jail telephone calls. During the call, defendant relayed to the individual on the other end he knew Fairchild had been involved in the controlled buy transactions because "that's the only person I sold anything f*** over 15 grams."

¶ 12        Joni Little, a forensic scientist with the Illinois State Police, testified she weighed and tested the substances obtained from the three controlled buys. The substances weighed 14.4 grams, 23.9 grams, and 6.8 grams, respectively, and all three tested positive for the presence of methamphetamine.

¶ 13        The jury found defendant guilty on all three counts of delivery of methamphetamine.

¶ 14        On November 30, 2023, defendant filed a *pro se* motion for a judgment of acquittal notwithstanding the verdict, or in the alternative, a new trial, and on December 7, 2023, he filed another *pro se* pleading titled "Article 78 ('Notice of appeal')."

¶ 15        On January 23, 2024, at defendant's request, the trial court appointed the public defender to represent him. On March 25, 2024, counsel informed the court he adopted both of defendant's *pro se* findings and considered them to be a single motion for a judgment of acquittal notwithstanding the verdict, or in the alternative, a new trial. Following argument, the court denied the motions and proceeded with sentencing.

¶ 16        Defendant's presentence investigation report (PSI) indicated the following. Defendant had a criminal history dating back to 1993. This history included convictions for such drug-related offenses as possession of drug paraphernalia in 2000, possession of a controlled substance in 2002, possession of a controlled substance and transportation of anhydrous ammonia in 2003, manufacturing of less than 15 grams of methamphetamine in 2015, possession of less than 5 grams of methamphetamine in 2016, and possession of drug paraphernalia in 2022. Defendant grew up with parents who had a history of substance abuse. He reported having been diagnosed with anxiety, depression, and attention-deficit/hyperactivity disorder. He obtained his GED in 2019 and was in the process of obtaining his bachelor's degree online from Colorado Technical

University. He had two children with a former spouse and described his relationship with them as " 'not good,' " as they did not "want anything to do with him until he is clean."

¶ 17    The State recommended the trial court sentence defendant to 24 years' imprisonment. In support, the State noted defendant had a lengthy criminal history, including drug offenses involving methamphetamine, "which is clearly a very dangerous drug that is basically plaguing this community and the surrounding communities." Given that history, the State argued defendant was "not willing to live a law-abiding life" and had no intention of ending his involvement with methamphetamine.

¶ 18    Defendant's counsel argued the trial court should consider drug court or impose the minimum prison term of six years. Counsel highlighted since 2021, although defendant had been convicted of possession of drug paraphernalia and pleaded guilty to an additional misdemeanor offense, "that's it." Accordingly, this contradicted the State's position that defendant "is somebody that cannot be in society, will always be selling drugs or always be a criminal." Additionally, counsel argued defendant previously was incarcerated for only 6 years, such that a sentence of 24 years would be "a very large leap."

¶ 19    Defendant gave a statement in allocution, asserting he had a drug problem and needed help. He further stated:

> "It's [(methamphetamine)] a very severe drug. Our community needs help, and I think I could be [the] one who could help our community to see that. 'Cause I know if I get out and I can stay clean, I've got friends that I know need to stay clean, and I'm going to push to get them clean. And*** guarantee that helps our society a lot. We have a big epidemic going on. The epidemic of COVID ain't nothing compared to methamphetamine. Methamphetamine is very, very severe, and it's not easy to

get off of. It's not easy to get off of. I mean, I know it for a fact."

¶ 20　　Following both sides' arguments, the trial court stated, *inter alia*, the following:

"The Court's considered the [PSI] that's been submitted in this case. I've considered the arguments and recommendations of the attorneys, the statement of the defendant in allocution. I've considered all statutory factors in aggravation and mitigation. Whether I mentioned them here individually or not, I've considered all such factors. I've considered all relevant factors that the Court should consider when imposing a sentence in a serious felony case. Both sides and the defendant have indicated *** the severity of the methamphetamine crisis that's ongoing in the country. I tell people in this courtroom on a daily basis the effect methamphetamine has on the brain, that it basically destroys the brain. Most, probably 80 percent of the people that fail to appear in court are those that have been charged with simple possession of methamphetamine, because their brains are so pickled that they can't remember to come to court. And I always tell them to make special arrangements, to get a reminder or do something to try to get back to court.

Both sides have commented on this. The Court is well aware of the horrific effects that methamphetamine has had on the community after methamphetamine took over for heroin and opioid addiction, primarily because people were dying on heroin and opioid overdose. And many people thought methamphetamine may be a safer alternative. Which it may be, but there are also deaths attributed and lives destroyed attributed to methamphetamine.

*** [T]his is a very serious case that involves two Class 1 felonies of delivery of methamphetamine, and one Class X felony. The charges involve a Class

1 with both weights of 14—close to 14—a little over 14 grams, a little over 6 grams. And then the Class X felony, over 23 grams of methamphetamine.

The defendant knows the deprecating effects of his addictions. In particular, his own children won't speak with him or have anything to do with him as a result of his drug addictions, unless he gets clean. That in and of itself demonstrates the horrific effects of these drugs, if someone chooses drugs over their own family, especially their own children. That is an indication of the horrific effects of the addiction that these drugs bring with them.

\*\*\*

\*\*\* [T]here's been a mention of drug court. This offense in my mind is an offense that \*\*\*—and I'll preface this by saying, in prior occasions, in other cases that I believe appropriate, I've stayed sentencing hearings and have had evaluations for drug court conducted, because I felt that those individuals had committed crimes that were appropriate for drug court. Their life was at a certain state that I believed drug court to be an appropriate sentence in those cases. I don't believe this to be a similar situation. While I think that \*\*\* the defendant would certainly benefit from drug court probation, I don't know that I'm confident that he would complete it. And these offenses I believe are such that a community-based sentence would deprecate the seriousness of these offenses and the ravaging effects that this particular drug is having on the community. To deprecate the seriousness of the offense is inconsistent with the ends of justice. Court in this case believes that a sentence to the Department of Corrections is necessary for the protection of the public."

Accordingly, the court sentenced defendant to concurrent terms of 20 years' imprisonment on all three counts.

¶ 21 On April 15, 2024, defendant filed a motion to reconsider the sentence, arguing only that the sentence imposed by the trial court was excessive. On July 31, 2024, the court denied the motion.

¶ 22 This appeal followed.

¶ 23 II. ANALYSIS

¶ 24 On appeal, defendant argues the trial court improperly considered the societal harm from the use of methamphetamine as an aggravating factor in sentencing, as such harm is inherent in the offense of delivery of methamphetamine. The State responds defendant forfeited this issue, and in any event, the court did not improperly consider general societal harm as an aggravating factor when sentencing defendant.

¶ 25 A. Forfeiture

¶ 26 Initially, we note defendant acknowledges his trial counsel did not object to the trial court's purported error at the time of sentencing, nor did counsel raise the issue of which he now complains in his motion to reconsider sentence. However, he argues for the relaxation of the forfeiture rule, as the sentencing error was the result of the court's improper reliance upon its own private knowledge or investigation of the societal harms of methamphetamine.

¶ 27 "A defendant generally forfeits review of the circuit court's consideration of improper evidence at a sentencing hearing if he fails to object at the hearing and fails to raise the issue in a postsentencing motion." *People v. Johnson*, 2024 IL 130191, ¶ 40; see 730 ILCS 5/5-4.5-50(d) (West 2022) ("A defendant's challenge to the correctness of a sentence or to any aspect of the sentencing hearing shall be made by a written motion filed with the circuit court clerk

within 30 days following the imposition of sentence."). The forfeiture rule ensures criminal defendants cannot sit idly by, knowing of an error, only to seek reversal for that error later, when the outcome of the proceeding is unfavorable. *Johnson*, 2024 IL 130191, ¶ 40. The rule also allows the trial court to address any potential errors. *Id.*

¶ 28 As support for his argument the forfeiture rule should be relaxed, defendant cites *People v. Dameron*, 196 Ill. 2d 156 (2001), for the proposition issues are less likely to be deemed unpreserved when the basis for the issue was the trial court's own conduct. However, defendant's reliance on *Dameron* is misplaced.

¶ 29 In *Dameron*, our supreme court determined the issue the defendant raised on appeal—that the trial court relied upon evidence outside the record in deciding to impose the death penalty following the defendant's murder conviction—was preserved because a " 'less rigid' " view of forfeiture applied where the purported error was the result of the trial court's own conduct. *Id.* at 171. Specifically, prior to sentencing, the trial judge unilaterally obtained from the library a social science book examining, *inter alia*, the growing number of young boys committing murders and the tendency of delinquent adolescents to have antisocial proclivities early in life. *Id.* Additionally, the judge obtained a transcript of comments made by his father, also a trial judge, at a sentencing hearing in a prior, unrelated murder case. *Id.* At the defendant's sentencing, the trial judge quoted the book he obtained at length and, relying upon both the book and transcript, spoke extensively about social science statistics, crime generally, and how the defendant's case compared to the case over which his father presided. *Id.* at 172-74, 177-79. In total, approximately half of the court's comments during sentencing were in reference to the unrelated book and transcript, and the court ultimately sentenced the defendant to death. *Id.* at 162, 179.

¶ 30 On appeal, the defendant argued the trial court denied him a fair sentencing hearing

by relying upon evidence outside the record when deciding his sentence, but the State countered the defendant had forfeited the issue by failing to object at the sentencing hearing. *Id.* at 171. The supreme court determined although the defendant failed to object at the time the trial court imposed its sentence, the forfeiture rule warranted relaxation since the error was brought about by the trial court's own conduct of unilaterally seeking out unrelated materials and extensively relying on those materials at sentencing. *Id.* Accordingly, the supreme court deemed the issue preserved and reviewed it *de novo*. *Id.*

¶ 31　　　　*Dameron* is distinguishable from the case *sub judice*. Although the supreme court signaled the forfeiture rule might be relaxed under certain circumstances where the basis for the alleged error was the trial court's own conduct, we do not believe the actions taken here are congruent with those in *Dameron*. Here, the trial court did not engage in the extensive unilateral investigation as was present in that case. The court did not seek out or use literature and unrelated transcripts obtained prior to sentencing to aid in its assessment of the appropriate punishment. Nor did the court quote from any such sources when it sentenced defendant. Indeed, as the court recognized, "Both sides *** commented on" the "horrific effects that methamphetamine has had on the community." Defendant himself discussed the harm posed by methamphetamine by noting that (1) methamphetamine is a "very severe drug," (2) as a result, the "community needs help" because "it's not easy to get off of," and (3) he could advocate for others to "stay clean," which would "help[ ] our society a lot." To the extent the court made comments about the community, they were in consideration of and in response to points raised by both parties; they were not the result of its engaging in an extrajudicial investigation. Accordingly, we do not find persuasive defendant's reliance on *Dameron* to urge relaxation of the forfeiture rule. Therefore, because defendant neither objected at the time of sentencing nor raised the issue of which he now complains

- 11 -

in his posttrial motion, we honor his forfeiture.

¶ 32                                 B. Plain Error

¶ 33        Defendant nevertheless requests that we review for plain error whether the trial court relied upon an improper aggravating factor during sentencing. Under the plain-error doctrine, a court may disregard a defendant's forfeiture and consider an unpreserved error when a clear or obvious error occurred and either (1) " 'the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error' " or (2) " 'the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process.' " *People v. McGath*, 2017 IL App (4th) 150608, ¶ 67 (quoting *People v. Belknap*, 2014 IL 117094, ¶ 48). The defendant bears the burden to show both a clear or obvious error occurred and a prong of the plain-error doctrine applies. *People v. Mays*, 2023 IL App (4th) 210612, ¶ 78.

¶ 34        Defendant argues the issue should be reviewed as first-prong plain error, as the evidence at the sentencing hearing was closely balanced and the trial court's consideration of the inherent harm caused by methamphetamine threatened to tip the scales of justice against him. Defendant notes the court did not mention aggravating or mitigating factors beyond his criminal history. He further contends there were multiple mitigating factors, including: (1) he grew up with parents who had a history of substance abuse, (2) he had mental health issues and a history of substance abuse, and (3) he obtained a GED and was seeking a bachelor's degree. We first consider whether a clear or obvious error occurred. *People v. Fisher*, 2023 IL App (4th) 220717, ¶ 29 ("To establish plain error in the sentencing context, a defendant must first show that a clear or obvious error occurred.").

¶ 35        "A reasoned judgment as to the proper sentence to be imposed must be based upon

the particular circumstances of each individual case." *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977). Accordingly, the trial court might consider the defendant's criminal history, the defendant's potential for reform, and the interests in deterring further crime and protecting the public. *McGath*, 2017 IL App (4th) 150608, ¶ 63. "However, a factor implicit in the offense of which the defendant has been convicted cannot be used as an aggravating factor." *Id.* ¶ 63. Such consideration is known as a double enhancement and is prohibited since the legislature, in designating the appropriate range of punishment for a criminal offense, necessarily considered the factors inherent in the offense. *Id.* ¶ 64. Nevertheless, we presume the court based its sentencing decision on proper legal reasoning, and we will consider the record in its entirety, as opposed to a few words or statements the court made. *Id.* ¶ 64.

¶ 36        We find *McGath*, which neither party cites, instructive. In *McGath*, the defendant was convicted of unlawful delivery of a controlled substance and sentenced to 25 years' imprisonment. *Id.* ¶ 1. In sentencing the defendant, the trial court stated the following:

> " 'I think you recognize just the out of control epidemic in our community and across the State and I think across the country with heroin addiction; and we are just losing the battle big time. I think there's been four or five overdoses in this county in the last several months from drug addiction. People that I've set a bond on have bonded out and overdosed and died. That bothers me tremendously as a person in this community.
>
> And I'm saying that because I recognize that [the defendant] and based upon the information in the [PSI] clearly has struggled forever with substance abuse addictions and not just heroin. Cocaine, alcohol. You know, your PSI is just a nightmare. It just, it's really heartbreaking. And you were dealt with what I would

- 13 -

say is a really, really crappy hand.

* * *

But dealing drugs threatens serious harm within our community, not just to the person that's doing the drugs who very well could overdose but to the responders when they are addressing people with overdoses. That it creates potential for accidents. They are responding to an overdose, and that takes them away from other crimes. So, I mean—or not crimes but other investigations or calls that they can be responding to. It has a ripple effect in the community when you deal drugs.' " *Id.* ¶ 19.

¶ 37 On appeal, the defendant argued, *inter alia*, the trial court improperly considered as an aggravating sentencing factor the societal harm caused by drugs and drug dealers. *Id.* ¶ 65. We rejected that argument, noting, in context, the court's comments were made in response to defense counsel's argument that defendant's conduct did not cause or threaten serious physical harm and that defendant did not contemplate that his conduct would cause or threaten such harm. *Id.* ¶ 71. We further explained, "[F]actors inherent in the offense can sometimes be considered, along with other factors in aggravation and mitigation, as part of the nature and circumstances of the case." *Id.* ¶ 73. Accordingly, "a trial court may discuss the impact a drug offense has on the community without subjecting the defendant to double enhancement." *Id.* In that vein, we agreed with the Second District's view:

" 'It is not improper *per se* for a sentencing court to refer to the significant harm inflicted upon society by drug trafficking. It is important that defendants understand why they are subject to the penalties provided by law and why they have received their particular sentences. The harm that the crime causes society is an

- 14 -

inherent consideration which underlies the basic range of penalties specified by the legislature. Commenting on the problems caused by drug-related crime encourages rehabilitation by providing a context in which a defendant may develop feelings of remorse. We do not wish to discourage courts from addressing such relevant considerations, but we suggest that sentencing courts attempt to segregate such general commentary from the balancing of sentencing factors.' " *Id.* (quoting *People v. McCain*, 248 Ill. App. 3d 844, 852 (1993)).

¶ 38       Here, when read in context of the entirety of the trial court's sentencing comments, it is evident the court discussed general societal harm to emphasize the seriousness and nature of the offenses committed by defendant. We note the court did not explicitly state it was considering general societal harm as an aggravating factor, which distinguishes this case from several cited by defendant where the appellate court determined the trial court improperly relied upon societal harm when imposing a sentence. See *People v. Maxwell*, 167 Ill. App. 3d 849, 852-53 (1988) (stating there was improper consideration of harm inherent in delivery of cocaine where the trial court explicitly deemed the " 'serious harm to many people' " caused by delivery of cocaine to be a sentencing factor " '[i]n aggravation' "); *People v. Corn*, 358 Ill. App. 3d 825, 827 (2005) (stating there was consideration of an improper sentencing factor where the trial court "declared that the amount of methamphetamine that the anhydrous ammonia could produce, and its resultant 'harm to the community in general,' was a serious threat that aggravated the defendant's criminal conduct"); see also *People v. Glenn*, 363 Ill. App. 3d 170, 181 (2006) (stating there was erroneous consideration of an improper sentencing factor where "the trial court made an express finding that the harm threatened to others was an aggravating factor"). As we recognized in *McGath*, it is not inherently improper for a court to refer to the harm endured by society through drug trafficking.

¶ 39        Additionally, the trial court's comments regarding societal harm were merely responsive to arguments made by both parties at sentencing. The State emphasized imprisonment was necessary because defendant continued to involve himself with methamphetamine, a "very dangerous drug" that was "plaguing this community and the surrounding communities." Defendant's counsel countered defendant was not the type of person "that cannot be in society," given his relatively sparse criminal history since 2021. During defendant's statement in allocution, he acknowledged the negative effects of methamphetamine upon society. Defendant also noted methamphetamine is a "severe drug" that is "not easy to get off of." He also emphasized the "community needs help," describing the prevalence of methamphetamine as an "epidemic." Defendant asserted he believed he "could be [the] one who could help our community" because he could "stay clean" and would "push to get [his friends] clean." The court's subsequent references to the harms caused by methamphetamine in the community merely conveyed its agreement with the State that the seriousness and nature of the offenses rendered imprisonment a more appropriate punishment than a community-based sentence.

¶ 40        The trial court was free to address the harms experienced in society that result from the delivery of methamphetamine in assessing the appropriate punishment, given the nature and circumstances of the case. Although defendant claims the court considered such societal harm to be an aggravating factor, the record does not bear this out, and he presents no convincing argument that the court's consideration of such harm was improper. When read in context, we interpret the court's comments as merely discussing the nature and seriousness of the offenses, not as suggesting the court was enhancing defendant's sentence based on something inherent in the offenses. Accordingly, we conclude defendant has failed to meet his burden to establish a clear or obvious error occurred. Because we discern no clear or obvious error, there likewise was no plain

error.

¶ 41                                     III. CONCLUSION

¶ 42         For the reasons stated, we affirm the trial court's judgment.

¶ 43         Affirmed.