2021 IL App (1st) 180111-U

No. 1-18-0111

Order filed June 30, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 11 CR 2889 |
| | ) | |
| DIONTAE CALHOUN, | ) | Honorable |
| | ) | William H. Hooks, |
| Defendant-Appellant. | ) | Judge presiding. |

JUSTICE BURKE delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's conviction for first-degree murder where there was sufficient evidence to convict him of the offense and the trial court did not abuse its discretion in precluding him from presenting evidence of the violent character of his victim as well as three individuals involved in the case. We also affirm defendant's 65-year sentence where the trial court did not excessively sentence him, but we modify his mittimus to reflect only one conviction for first-degree murder and a three-year term of mandatory supervised release.

¶ 2 Following a jury trial, the jury found defendant Diontae Calhoun guilty of first-degree murder and that, during the commission of the offense, he personally discharged a firearm that proximately caused death. The trial court subsequently sentenced him to 40 years' imprisonment for the first-degree murder and then imposed the mandatory 25-year enhancement for personally discharging a firearm that caused death for a total sentence of 65 years' imprisonment. On appeal, defendant contends that: (1) the State failed to sufficiently prove his guilt for first-degree murder; (2) the trial court erred in barring evidence of the violent character of the victim as well as three individuals involved in the case; (3) his 65-year sentence was excessive; and (4) his mittimus must be corrected to reflect that he was convicted and sentenced on only one count of first-degree murder and to reflect the statutorily authorized term of three years of mandatory supervised release. For the reasons that follow, we affirm defendant's conviction and sentence, but amend his mittimus, as requested.

¶ 3                                    I. BACKGROUND

¶ 4 A grand jury indicted defendant with six counts of first-degree murder for the January 10, 2011, shooting death of Eric Thompson. Relevant here is Count V, which alleged that defendant, without lawful justification, intentionally or knowingly shot and killed Thompson while armed with a firearm, and during the commission of the offense, he personally discharged a firearm that proximately caused death.

¶ 5                                  A. *Lynch* Motion

¶ 6 In defendant's answer to the State's motion for discovery, he asserted that he may raise self-defense at trial and that he may call various witnesses to testify about the violent character of Thompson and other people present at the scene of the shooting. Defendant subsequently filed a motion to admit evidence pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984) and Illinois Rules of

Evidence 404(a)(2) and 405(b)(2) (eff. Jan. 1, 2011). In the motion, defendant claimed the evidence indicated that he was being confronted by various people in an apartment building hallway, including Thompson, Michael Craig, Edward Bibbs, Jr., and Shensky Berry, when the shooting occurred. As such, defendant sought to present evidence regarding the violent and aggressive nature of these four men.[1]

¶ 7     Concerning Thompson, defendant sought to introduce evidence that Thompson punched a man in the mouth in October 2006, and the police arrested him for the incident. Concerning Craig, defendant sought to introduce testimony from a woman who he allegedly battered in August 2003 as well as testimony from the police officers who arrested him for the incident, a certified copy of disposition for murder from a 1988 case, testimony from a woman who Craig allegedly raped in February 1986 as well as testimony from the police officer who arrested Craig for the incident, and a certified copy of disposition for rape from a 1981 case. Concerning Edward, defendant sought to introduce testimony from a man who alleged that Edward threatened to beat him in August 2009 as well as the police officer who arrested Edward for the incident, testimony from a woman who alleged that Edward threatened to kill her during a verbal altercation in April 2006, testimony from a woman who alleged that he beat her and threatened to kill her in September 2003 and hit her again in December 2005, as well as the police officers who arrested Edward for these incidents, in addition to various other instances of Edward being allegedly violent.

¶ 8     Concerning Berry, defendant sought to introduce testimony from Berry's mother that he battered her in May 2013 and the police officer who arrested Berry for the incident, a certified copy of disposition for domestic battery from a 2013 case—presumably the incident involving

---

[1] Edward Bibbs, Jr., will be referred to as Edward because he shares the same last name as multiple people in this case.

Berry's mother—evidence of multiple instances where Berry was violent with the same woman in March 2012 and August 2001, including testimony from the police officers who arrested him for these incidents, a certified copy of disposition for domestic violence from a case in 2011, a certified copy of disposition for domestic assault from a case in 2009, evidence of multiple instances where Berry allegedly became violent with a woman he knew was pregnant with his child in 2007, and various other instances of Berry being allegedly violent. In total, defendant sought to introduce approximately 50 witnesses to testify about various incidents involving Thompson, Craig, Edward and Berry, some postdating the shooting death of Thompson by two years and some as far back as 30 years before his death. With the exception of Craig's murder conviction, defendant argued all the other actions of Thompson, Craig, Edward and Berry were admissible to support his version of the facts where there were conflicting accounts of what occurred on the night of January 10, 2011. The State responded and objected to defendant's request to admit the character evidence of Thompson, Craig, Edward and Berry.

¶ 9    In a written order, the trial court observed that Thompson was the victim in the case, while Craig, Edward and Berry were allegedly present at the scene at the time of the shooting. The court observed the two prongs of *Lynch*, one being to show the defendant's knowledge of his victim's violent tendencies and two, to support the defendant's version of events where there were conflicting accounts of what happened. The court noted that all of the proffered evidence fell into the second prong except for the evidence of Craig's murder conviction. Concerning the evidence that Thompson allegedly punched a man in October 2006, the court found the incident too remote temporally and that the act did not involve anyone related to defendant's case. Therefore, the court denied defendant's request to introduce evidence of Thompson's alleged battery at trial.

¶ 10 Concerning the character evidence of Craig, Edward and Berry, the trial court relied on *People v. Figueroa*, 381 Ill. App. 3d 828 (2008), and concluded that *Lynch* did not apply because the three men were not defendant's victims. Furthermore, regarding Craig's murder conviction, beyond whether *Lynch* applied to nonvictims, the court remarked that defendant did not know Craig, so it was impossible for defendant to have knowledge of Craig's murder conviction and alleged violent tendencies. Additionally, beyond these flaws, the court insinuated that many, if not all, of the character evidence of the three men were too remote to be admissible. With regard to Craig and Edward, the court highlighted that some of their prior acts of violence were quite old. And with regard to Berry, the court noted that his prior acts of violence were "almost entirely domestic in nature" and "range[d] from 15 years prior to the incident to postdating the incident." According to the court, "[a] remoteness factor is clearly relevant here" concerning the prior violent acts of Craig, Edward and Berry. Consequently, the court denied defendant's *Lynch* motion in all respects.

¶ 11                                    B. Trial

¶ 12                                 1. State's Case

¶ 13 The case proceeded to a jury trial, where, in the State's case, Tiffany Bibbs testified that she had a son with defendant and that in January 2011, they had an on-again and off-again relationship.[2] On January 8, 2011, Tiffany had a birthday party for her daughter that defendant appeared at uninvited. At the party, Tiffany and defendant had a brief argument about her paying for his phone bill, which she had refused to do. Afterward, defendant left the party.

---

[2] Witnesses will be referred to by their first name when they share a last name with someone else involved in the case.

¶ 14    In the evening of January 10, 2011, Tiffany went to a party at a four-story multi-unit apartment building located on the 4100 block of West Wilcox Street in Chicago. Various members of Tiffany's family lived in the building, including her sister, Theresa Bibbs, on the second floor and her niece, Cheree Span, on the first floor as well as some cousins, Ricky Clay and Cornelius Clay, who also lived on the first floor next to Span's apartment. When Tiffany arrived at the building, she dropped off the son she shared with defendant with Theresa, who lived with her boyfriend, Michael Craig. Tiffany then went downstairs to Span's apartment, where people were hanging out and drinking. In Span's apartment at various points in the night were Tiffany's sister, Veronica Bibbs, Tiffany's niece, Bianca Bibbs, Tiffany's cousin, Natasha Clark, Tiffany's nephew, Eric Thompson, Craig, Shensky Berry, a family friend, and other family members.

¶ 15    At some point in the night, Tiffany learned that defendant had shown up uninvited. When she learned this detail, she went upstairs to Theresa's apartment to check on her son, who was sleeping. However, Tiffany observed defendant along with Craig. Defendant began grabbing her, asking her if she missed him and telling her that she was his "b*** forever." Tiffany told defendant to let her go and leave her alone. She then went downstairs to the first floor where she saw Scott Hicks, who worked as a contractor for Dish Network. Hicks, who had a felony conviction for theft, was often at the building for work and became friends with some of the tenants, including Tiffany.

¶ 16    Shortly after Tiffany ran into Hicks, defendant appeared and began angrily asking if Tiffany and Hicks were intimate together. After Tiffany responded no, defendant grabbed her, pulled on her hair and again told her she was his "b***." When Tiffany told him they were broken up and to leave her alone, defendant poured liquor on her head. Hicks corroborated Tiffany's account and observed defendant pull Tiffany's hair and pour liquor on her face. Other members of Tiffany's family witnessed defendant's actions, including Span, who observed defendant "choke

her, pull her hair, push her to the wall and thr[o]w alcohol in her face." Similarly, Clark, who had a felony drug conviction and had given the police aliases various times over the years, saw defendant grab Tiffany's hair, grab her by the back, throw her against a wall and pour liquor on her face. When this occurred, a couple children, including Tiffany's 10-year-old son, came out into the hall with broomsticks, but Hicks told them to stay inside. Other adults came into the hallway, too, but no one intervened except for Hicks, who only did so verbally and told defendant to stop. This made defendant angry, but ultimately caused him to stop. According to Tiffany, as defendant was leaving, he said he would be back with a gun, though, at trial, she acknowledged not telling the police this detail. However, Hicks also heard defendant say that he was going to get his gun. Additionally, Span heard defendant tell Tiffany that he was going to be back and "kill her," though, at trial, Span acknowledged not telling the police this detail. Clark similarly heard defendant say he would be back and observed that he left on his own accord, with no one forcing him out physically.

¶ 17    Once defendant left, Hicks became immediately shaken by defendant's threat and called the police. According to Hicks, the police arrived, but because defendant was not there, they left. Hicks likewise left the apartment building. As he left in his vehicle, he observed defendant walking down a nearby street toward the apartment building. They made eye contact, but Hicks continued on his way home.

¶ 18    After the altercation with defendant, Tiffany went back into Span's first-floor apartment. About an hour later, Clark told Tiffany that defendant was back. Tiffany did not want to see him, so she stayed in the apartment. Shortly thereafter, Berry, who had been previously convicted of felony domestic battery, knocked on Span's door looking for Tiffany. When Tiffany cracked opened the door to see Berry, she observed defendant walk behind him. Defendant then raised his

shirt and revealed part of a firearm. Tiffany shut the door and told her family that defendant was trying to scare her with a firearm. Tiffany thought the firearm was fake because, in the past, defendant had told her he used a fake gun to rob people. A little while later, according to Span, Thompson, who had been hanging out in her apartment, left and went to smoke marijuana with some other family members. At trial, Clark denied going to smoke with Thompson, explaining that she only smoked cigarettes.

¶ 19 A little later, according to Craig and Berry, Thompson and defendant became involved in an argument in the hallway of the second floor. Berry observed that Thompson was upset that defendant had "touch[ed]" Tiffany, his aunt. Berry joined in and began arguing with defendant, too. But, during the argument, defendant pulled out a sawed-off, double-barrel shotgun, causing Berry to leave and go down to the first floor. Around this time, Craig also left the second floor and walked with Thompson back toward Span's first-floor apartment. As they were walking, Craig did not see anything in Thompson's hands, and Craig himself did not have anything in his hands. Defendant followed Thompson, and they began arguing again in the hallway of the first floor.

¶ 20 From Span's apartment, Tiffany, Span and Clark could hear arguing outside in the hallway and then a knock on the front door. Span heard defendant scream and yell "[f]*** you" while Clark heard him yell "[f] this, I don't have to take this." Veronica also heard the arguing, and at trial, she denied that she had witnessed the earlier argument between defendant and Thompson. According to Berry, who was in the first-floor hallway, Thompson told defendant that he "ain't going to do none of that." When Clark opened the front door, she, Veronica and Tiffany could see Thompson. For a few seconds, Tiffany could see that Thompson and defendant were still arguing. According to Tiffany, defendant then said "no, f*** you," walked up behind Thompson, took out a sawed-off double-barrel shotgun and shot Thompson in the head. The gunshot caused Thompson to fall

flat on his head into the door frame. The shooting was also witnessed by Clark, Craig, Berry, Span and Veronica. Clark observed that, when defendant appeared behind Thompson, Thompson turned his head slightly over his shoulder and then was shot. Though, at trial, Clark acknowledged not telling the police this detail. Craig, who was approximately 10 feet away, did not observe anyone near defendant. Berry was down the hallway when the shooting happened, and from what he could remember, no one was touching defendant when he shot Thompson. Berry, though, could not remember who was in the hallway when the shooting occurred. Tiffany, Veronica and Clark likewise did not see anyone near defendant when he shot Thompson. From Span's vantage point, she did not see anyone around defendant or fighting with him when he shot Thompson. Craig observed defendant leave the building, and at trial, denied chasing after him. Someone then called the police.

¶ 21 Chicago Police Detective Brian Drees arrived at the apartment building after the shooting and found that the building had four security cameras, three on the exterior and one in the foyer. In reviewing the video from these cameras, Detective Drees observed a subject that appeared to be defendant enter the building at 9:29 p.m. and leave the building 10 minutes later. Additionally, Detective Drees observed a subject that appeared to be defendant enter the building again at 11:13 p.m. and then, a little bit later, running out of the building carrying what appeared to be a shotgun. The next day, Monica Tate, who lived about a block and a half away from the apartment building, found a firearm that looked like a small rifle in her garbage bin. She called the police, who responded and recovered the firearm. Ultimately, on January 25, 2011, officers with the Waukegan Police Department arrested defendant in Waukegan, Illinois.

¶ 22 A forensic investigator with the Chicago Police Department took biological swabs from the firearm Tate discovered, which were then sent to the Illinois State Police for further testing and

analysis. A forensic scientist with the Illinois State Police determined that DNA recovered from the shotgun matched the known sample of defendant. The shotgun itself was analyzed by Kurt Murray, a forensic scientist with the Illinois State Police and expert in the field of firearms and toolmarks examination. At trial, Murray described the firearm as a 100-year-old sawed-off double-barrel shotgun that had epoxy added to the action frame that prevented him from examining the firearm internally. Murray stated that the shotgun required a single action to shoot from either barrel, meaning someone would have to manually cock the hammer and then pull the trigger to shoot the weapon. Murray added that the shotgun was not meant to fire modern ammunition, but rather only black powder cartridges. When he test fired the shotgun, he found that the right trigger performed as he would have expected, but the left trigger needed less force to fire and it was possible to fire from the left barrel without cocking the hammer if more force was used, in part, because the left side did not have an additional safety notch. During his testimony, Murray noted several safety concerns with the shotgun, including the potential for an accidental discharge because the hammer of the shotgun could strike the firing pin without a pull of the trigger. Moreover, Murray concluded that the shotgun could have accidentally discharged either with or without the hammer cocked, the latter if enough force was applied to the hammer itself or directly to the firing pain.

¶ 23    The medical examiner ruled that Thompson's cause of death was a shotgun wound to the head and the manner of death was a homicide. The medical examiner concluded that the wound was to Thompson's left side and the "wound course" was from front to back. The toxicology report indicated that Thompson tested positive for ethanol, but negative for benzoylecgonine and opiates—the only substances for which he was tested.

¶ 24                                    2. Defense's Case

¶ 25   In the defense's case, Ricky Clay testified that, on January 10, 2011, he lived in the apartment building located on the 4100 block of West Wilcox Street, specifically on the first floor, where he also was employed as a maintenance worker. Clay lived directly next to Span's apartment and had a brother and cousins who lived in the building on various floors, including Theresa. Clay and Thompson were also cousins. On the night of January 10, Clay was in his apartment along with his brother, Cornelius, and a friend nicknamed L.B. While the three of them were eating, Clay heard the loud voices of Thompson, Edward Bibbs, Jr., another one of Clay's cousins, and Craig. Clay looked through his peephole and observed Edward, Craig and defendant, who was just standing outside Clay's door and not really doing anything. Clay also heard Edward and Craig attempting to "kill" the confrontation. Then, Clay observed someone, who he believed was Thompson, point his finger at defendant and poke defendant in the forehead, but he could not see the person because his view outside into the hallway was partially obstructed by a column. Clay then heard Thompson call defendant a "punk-a** mother***" and then threaten to kill him if he tried to "touch" Tiffany again. Clay did not see anyone move, but shortly thereafter, he heard a loud noise and later learned that Thompson had been shot.

¶ 26   Defendant testified that, in January 2011, he worked in construction and had been in an on-again, off-again relationship with Tiffany, with whom he shared a son. During this time, defendant owned a sawed-off shotgun that he had purchased a year earlier on the street for protection after he had been robbed. When he bought it, the firearm was already loaded, and he did not make any modifications to it. Defendant had never shot it before January 2011, and it had never accidentally discharged in the year he had owned the weapon.

¶ 27   On January 10, 2011, defendant went to the apartment building on the 4100 block of West Wilcox Street to visit his son and had the shotgun with him, as he carried it all of the time. When

defendant arrived, he observed there was a party going on with about 20 family members and friends of Tiffany's. At some point after arriving, he became involved in argument with Tiffany because she was talking to Hicks, someone defendant did not know. Eventually, during the argument, defendant threw liquor on her. After Tiffany pushed him, defendant pushed her off of him and left the apartment building. At trial, he denied ever physically touching Tiffany any other time during their argument, denied saying that he would be back with a firearm and denied saying that he was going to kill someone. After leaving the building, he walked a couple blocks away and smoked a cigar.

¶ 28    Later, defendant returned to the apartment building so that he could see his son. When he arrived, he was on the first floor and observed five or six people, some of whom he recognized, including Clark. Defendant asked her if she would get Tiffany for him because he wanted to talk to her about their son. Clark went to an apartment on the first floor, and after Tiffany opened the door, she immediately shut it. At trial, defendant denied flashing a firearm at her. Next, defendant went up the second floor to see his son, but he was unable to because he was approached by Thompson and Berry, who asked why defendant was "f***ing" with Tiffany. One of them had a metal object, but defendant could not tell what it was, so he pulled out his shotgun and told Thompson and Berry "to get back." Both Thompson and Berry walked past defendant and left the second floor. Defendant was "afraid" so he tried to leave the apartment building and went down the stairs but encountered five or six people, including Edward, Craig, Berry and Thompson. Thompson began "poking" defendant in the forehead and threatening to kill him. In response, defendant again took out his shotgun to scare Thompson, but suddenly, the group attacked him, punched him in the mouth and tried to grab the shotgun. According to defendant, some members of the group had knives and someone had a bat. During the tussle, defendant claimed the shotgun

accidentally discharged. Defendant had no clue if someone had been shot, but wanted to get away from the apartment building, so he ran and thew the shotgun in a garbage bin a couple blocks away. Defendant learned the next day that Thompson had been shot and killed. At trial, defendant denied intentionally pulling the trigger and asserted that he had no idea what caused the firearm to discharge.

¶ 29 About two weeks later, defendant was arrested by the police in Waukegan, but, at trial, he could not recall talking to them about the night of the shooting, though he acknowledged watching a videotaped conversation with the police about that night. However, at trial, defendant stated he watched the video a long time ago and could not remember anything he said. Defendant did not go the police on his own because he was scared of being incarcerated. During the trial, the trial court allowed the defense over the State's objection to play defendant's complete statement to the police under the rule of completeness. In the videotaped statement, defendant acknowledged that he had an argument with Tiffany about Hicks and threw liquor on her. However, he claimed that, later, Tiffany's cousins surrounded him and attacked him, which caused the shotgun to discharge. Defendant told the police that he was afraid of Tiffany's family because they had previously attacked him and another time, her family attacked a person so badly that the person was unrecognizable afterward.

¶ 30 The defense's last witness was Matthew Noedel, an expert in firearm examination and crime scene reconstruction. Noedel testified extensively about defendant's shotgun and immediately noted that, when a firearm had been modified, there was the potential for accidental discharges. Additionally, due to the age of the firearm, he observed there had been epoxy and non-original screws put into the firearm that were "holding it together." Due to the modifications of the firearm, Noedel determined that the shotgun was essentially "two guns fused together" with

independent firing mechanisms on both sides. Neither side had an external safety, and although both sides had a "rebound" safety, the left side's rebound safety was not operational. Given the shotgun's age and modifications, Noedel concluded that it could accidentally discharge, which meant that the shotgun could discharge without anyone pulling the trigger or the hammers being cocked. Noedel tested this by, in part, taking an eight ounce plastic mallet and lightly hitting the uncocked hammer of the shotgun in various places. Noedel was able to get both barrels to discharge.

¶ 31    The parties stipulated that Craig told a detective that, after the shooting, he chased defendant outside the building, but could not catch him. They further stipulated that Clark told a detective that she had smoked a "blunt" the night of the shooting. The parties also stipulated that Veronica told a detective that she witnessed defendant and Thompson arguing and tried to break up their fight. Lastly, they stipulated that Tiffany never told the police, a state's attorney or testified to during her grand jury appearance that, before defendant shot Thompson, he said "[f]*** you."

¶ 32                    C. Jury Instructions, Closing Arguments and Verdict

¶ 33    Following the defense's case, the parties discussed the jury instructions, and the trial court allowed the jury to be instructed on the defense's theories of self-defense, second-degree murder and involuntary manslaughter.

¶ 34    In the State's closing argument, it asserted that defendant was angry with Tiffany, highlighting the evidence of her refusal to pay his phone bill and then seeing her speaking with Hicks on the night of the shooting. Defendant's anger, according to the State, led him to become violent with Tiffany and ultimately pour liquor on her. Once confronted verbally by Hicks, defendant left and remarked that he would return with a firearm. The State noted that, when defendant returned, he tried to see Tiffany again, but she rebuffed him. Then, defendant got into a

verbal confrontation with Berry and Thompson. The State pointed out that its witnesses consistently testified that no one was around defendant or physically fighting with him before he shot Thompson in the head from point-blank range. The State concluded that the evidence pointed only to defendant committing first-degree murder.

¶ 35    In the defense's closing argument, defendant argued that Thompson's death was an "unintended accident." Defendant highlighted his trial testimony, which was consistent with his videotaped statements to the police, that he was confronted and attacked by multiple members of Tiffany's family, including Thompson, who threatened to kill him—a threat corroborated by Clay. In response, defendant took out his shotgun in self-defense and during the struggle, the shotgun accidentally discharged. Defendant observed that both experts concluded the gun could have accidentally discharged due to its age and modifications. Defendant further highlighted that the gunshot's wound course was from Thompson's front to back, which corroborated his theory that Thompson had been in his face when the shotgun discharged and contradicted the State's witnesses who claimed that defendant shot Thompson from behind. Defendant also noted many alleged discrepancies and incredible aspects of the testimony of the State's witnesses as well as their biases being related to, and friends with, Tiffany and Thompson. Defendant concluded that the State failed to prove that he committed first-degree murder and remarked that if his actions constituted anything that night, it was involuntary manslaughter for recklessly waving the shotgun.

¶ 36    Following closing arguments, the jury found defendant guilty of first-degree murder and that, during the commission of the offense, he personally discharged a firearm that proximately caused death.

¶ 37                    D. Posttrial and Sentencing

¶ 38 Defendant filed a motion for new trial, in part, arguing that the trial court erred in denying his pretrial *Lynch* motion. The court, however, denied the motion, and the case proceeded to sentencing. Defendant's presentence investigative report revealed that he was 24 years old at the time of the shooting and had been previously convicted of multiple nonviolent offenses. Defendant reported that he consumed alcohol once a week and regularly used marijuana. He also had received disability benefits for a learning disability since he was 8 years old and had been hospitalized for mental health issues when he was 15 years old.

¶ 39 At defendant's sentencing hearing, the trial court observed that the sentencing range for first-degree murder, including a 25-year enhancement based on defendant's personal discharge of a firearm proximately causing death, was between 45 and 85 years' imprisonment. The State presented Joseph Danzl, a deputy director with the Cook County Sheriff's Office, who testified that defendant had "exposed" himself in jail and had picked up two additional charges in jail: one for aggravated battery to a corrections officer and another for possessing contraband in jail. The defense tendered various character letters from defendant's family and friends, which highlighted the various difficulties he had growing up and indicated that he helped support his children.

¶ 40 The State argued that, based on defendant's actions of January 10, 2011, as well as his subsequent actions in jail, he was a "petulant child" who did "horrible things" when he did not get his way. The State highlighted that, when defendant did not get his way with Tiffany, he poured liquor on her and "ruffed her up." The State noted that, when defendant returned that night with the shotgun, he shot Thompson in the head for merely standing up for Tiffany. The State concluded by requesting a sentence that "honor[ed]" Thompson, who "stood up" to defendant.

¶ 41 Defense counsel initially read two of the character letters in support of defendant: one from Antoine McFadden, defendant's uncle, and another from Alfrieda Shepard, a Chicago Public

Schools employee who knew defendant. McFadden's letter detailed defendant's difficult upbringing, including that his father and best friend had both been murdered. McFadden's letter also noted that defendant himself was robbed and pistol whipped in 2009, which prompted him to carry the shotgun for protection. McFadden believed that these tragic events led defendant "into a state of fear every time he left home." In Shepard's letter, she described defendant as a "kind hearted, generous, helpful" and "amazing person." She observed that defendant's shooting of Thompson was out of character and an unfortunate "byproduct of his environment." She believed that defendant had accepted responsibility for his actions, had significant rehabilitative potential and was currently working toward a better life in jail.

¶ 42    Based on the letters and presentence investigative report, defense counsel observed that defendant had a learning disability and had to deal with many challenges in his life. Counsel noted that, prior to his incarceration, defendant had been working in construction to help provide for his children. However, the trial court interjected and asked counsel about the details of his employment and proof of income from it. Counsel replied that she did not have any paystubs to provide to the court. The court continued and asked to see proof that defendant "materially supported" his children. Counsel replied that part of his monthly disability check went to support his children and so did his earnings from his construction work. In closing, counsel highlighted that, even a minimum sentence was significant, and requested that the court consider all aspects of defendant before imposing a sentence. Additionally, defendant spoke in allocution. He apologized to Thompson's family, thanked his family for its support and thanked the trial court for a fair trial. Defendant asserted that the shooting was an "accident," and he did not intend to kill anyone.

¶ 43    The trial court initially remarked that it was not going to consider the alleged actions of defendant while in jail. The court observed that defendant's sentence was based on his murder of

Thompson plus his use of a firearm, but highlighted the firearm was not a handgun, but rather "a God awful [jerry]-rigged shotgun." The court highlighted the brutal manner in which Thompson died by being shot in the head and discussed its own experience in the military and in civil litigation and the unfortunate requirement to view:

> "pictures with respect to airline crashes, large airplanes crashes, and been involved in litigation that shows horrific scenes where planes crash. Horrific scenes where the Beirut Marines suffered, because the Marines had not set up the right perimeter for what should have been a fortified area; and a truck bomb came in, and injured, and killed, and disfigured a number of United States Marines who were victimized by terrorists."

The court concluded that, despite these experiences, the photographs in the instant case were "as graphic or more graphic."

¶ 44 The trial court highlighted defendant's theory at trial of self-defense, but rejected it and found that his actions were "no accident," "not a defense of anything" and "not the defense of any principle whatsoever, other than I want to take you out and show you how tough I am." Instead, the court asserted this was a shooting at close range with no "caring at all about the consequences." The court further highlighted defendant's character letters from family and friends, and observed that, in Shepard's letter, she claimed that defendant had taken responsibility for his actions. However, the court found that defendant had not accepted responsibility in any fashion until the day he was to be sentenced. The court added that, while defendant had a learning disability and a difficult upbringing, there were many similar children to defendant that did not grow up and "become murderers." The court then pondered aloud about "the proper relief for a community that's besieged with violence" and the type of message that needed to be sent to the next person

like defendant. The court remarked that it had to consider the impact of the murder on Thompson's family, whether defendant was a "safety risk" to the community, the horrific nature of the crime and the time it would take defendant to rehabilitate. In light of these factors and "the graphic and vicious nature of the murder itself," the court sentenced defendant to 40 years' imprisonment for the first-degree murder itself and then imposed the mandatory additional 25-year enhancement for personally discharging a firearm that caused death for a total sentence of 65 years' imprisonment.

¶ 45    Defendant filed a motion to reconsider his sentence. The record on appeal only contains the cover sheet for the motion, but during the trial court's discussion of it, the court observed that defendant had raised an excessive sentencing challenge due to his "background" and "the nature and his participation in the offense." However, the court denied the motion, and defendant subsequently appealed.

¶ 46                                    II. ANALYSIS

¶ 47                         A. Sufficiency of the Evidence

¶ 48    Defendant first contends that his conviction should be reduced from first-degree murder to involuntary manslaughter where no credible evidence established that he acted with the intent to kill or knowledge the shotgun would go off but rather the credible evidence showed that he acted recklessly when he pulled out and waved the antique shotgun at a group of men surrounding him and threatening him.

¶ 49    When a defendant challenges the sufficiency of the evidence, the reviewing court must determine if, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the offense proven beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35. All reasonable inferences from the evidence must be made in the State's favor. *People v. Hardman*, 2017 IL 121453, ¶ 37. Under this standard of review, it is not

the reviewing court's role to retry the defendant. *Gray*, 2017 IL 120958, ¶ 35. And the reviewing court will not substitute its judgment for that of the trier of fact on issues involving the credibility of witnesses, the weight to be afforded to the trial evidence, the drawing of reasonable inferences from the evidence and the resolution of conflicts within the evidence. *Id.* We may only reverse a conviction if "the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Id.*

¶ 50    To prove that defendant committed first-degree murder in this case, the State had to prove that he (1) performed the acts that caused Thompson's death; (2) he intended to kill Thompson or do great bodily harm to him, or knew that such acts would cause his death; and (3) he was not justified in using the force he used. 720 ILCS 5/9-1(a)(1) (West 2010). Conversely, involuntary manslaughter occurs when a person unintentionally causes the death of another person without lawful justification by acts that are performed recklessly and are likely to cause death or great bodily harm. 720 ILCS 5/9-3(a) (West 2010). "A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2010).

¶ 51    "The difference between involuntary manslaughter and first degree murder lies in the mental state that accompanies the conduct resulting in the victim's death." *People v. Robinson*, 232 Ill. 2d 98, 105 (2008). The defendant's mental state frequently must be inferred from circumstantial evidence. *People v. Eubanks*, 2019 IL 123525, ¶ 77. Specifically, a defendant's intent to kill may be inferred from "the character of the defendant's acts and the circumstances surrounding the commission of the offense [citation], including the character of the assault, the

nature and seriousness of the injury [citation], and the use of a deadly weapon [citation]." *In re T.G.*, 285 Ill. App. 3d 838, 843 (1996). The trier of fact may infer a specific intent to kill if surrounding circumstances demonstrate that the defendant "intended the willfully committed act, 'the direct and natural tendency of which is to destroy another's life.' " *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001) (quoting *People v. Migliore*, 170 Ill. App. 3d 581, 586 (1988)). Indeed, " '[t]he very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill.' " *Id.* (quoting *People v. Thorns*, 62 Ill. App. 3d 1028, 1031 (1978)). But the mere fact that a defendant discharged a firearm without more is generally insufficient to establish an intent to kill. *Id.* "The determination of a defendant's mental state is generally a question of fact for a jury to decide and is particularly appropriate for resolution by a jury when the evidence on the issue is conflicting." *People v. Yeoman*, 2016 IL App (3d) 140324, ¶ 19.

¶ 52    In the present case, the jury heard two different versions of what occurred on January 10, 2011. In the State's version, defendant was jealous and bitter after Tiffany refused to pay his cell phone bill two days earlier, rejected his advances the night of January 10 and then saw her talking to Hicks at the party. This caused defendant to become violent with Tiffany, pour liquor on her face and then leave the party. When defendant returned, he did so with a shotgun and got involved in a confrontation with Thompson, who was angry about defendant's behavior toward his aunt. According to the State and its witnesses, defendant did not appreciate being confronted over his actions, so he took his shotgun and, without any physical provocation, shot Thompson from point-blank range in the head. Conversely, in defendant's version, as testified to by him and Clay, Thompson, Edward, Berry and Craig all were surrounding him. Thompson, in particular, became very agitated, and poked defendant in the forehead and threatened to kill him. As such, according

to defendant, he took out his shotgun in self-defense, but the group attacked him with knives and a baseball bat. And, at some point during this tussle, the shotgun accidentally discharged.

¶ 53    In the State's version, defendant acted in cold blood and intentionally shot defendant without any legal provocation. In defendant's version, defendant was only defending himself and the firearm discharged when he recklessly took it out. This case presented a credibility contest between the State's witnesses and the defense's witnesses. It is true that the State's witnesses were impeached on various matters based on prior statements they had given and they were either related to Thompson and Tiffany, or friends with them or their family. However, what role their inconsistent statements and potential biases may have had on the credibility of their testimony was entirely within the purview of the jury to resolve. See *People v. Hernandez*, 319 Ill. App. 3d 520, 533 (2001) ("Inconsistencies in the testimony of the witnesses, bias or interest affecting their credibility, and the weight to be given to the testimony of witnesses are for the trier of fact to determine."). It is also true that most of the State's witnesses testified that defendant came up from behind Thompson and shot him in the back of the head, though Clark testified that Thompson turned his head slightly over his shoulder and then was shot. This testimony did tend to contradict the forensic evidence that Thompson had a wound to the left side of his head and the wound course was front to back. However, it is unrealistic to expect witnesses who view traumatic events, especially when those witnesses are related to the victim, to describe the events perfectly. See *People v. Rodriquez*, 100 Ill. App. 3d 244, 248 (1981) (finding "[i]t is unrealistic to expect witnesses to a sudden, violent stabbing to describe it with 'stop action' accuracy," and "[t]he exact positions of the parties and the precise sequence of their actions would be difficult for anyone to recreate perfectly"). Whether their testimony conflicted with the forensic evidence and what

weight to assign to their testimony given those potential conflicts was entirely within the purview of the jury to decide. See *Gray*, 2017 IL 120958, ¶ 35.

¶ 54    Similarly, although both the State's expert and the defense's expert opined that the shotgun could have accidentally discharged based on its age and modifications, the jury was not required to believe that the firearm did actually accidentally discharge in this case, but rather was merely required to listen to the testimony and determine its relative weight. See *People v. Hill*, 297 Ill. App. 3d 500, 517-18 (1998). Ultimately, the jury had a choice about whose version to believe and what culpability, if any, defendant had that night. The jury believed the State's version and that defendant acted intentionally in shooting Thompson. Reviewing courts generally should not second-guess these determinations. See *Gray*, 2017 IL 120958, ¶ 35; *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). Although we generally should not second-guess a jury's credibility determinations, that does not mean we " 'rubber stamp' credibility determinations." *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 19. "[W]hen identifiable factors undermining those determinations exist, it is appropriate to conclude that a court or jury acted unreasonably in accepting a witness's testimony." *Id.* However, that is not the case here where the State had multiple witnesses testify to defendant's legally unprovoked shooting of Thompson. And, as a result, the evidence of defendant committing first-degree murder was not so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of his guilt. See *Gray*, 2017 IL 120958, ¶ 35.

¶ 55    Nevertheless, defendant attempts to liken the facts of his case to those in *People v. Hoover*, 250 Ill. App. 3d 338 (1993). In that case, as the defendant was wrestling with her victim in a vehicle, a loaded firearm she was holding discharged. *Id.* at 346. Despite claiming the firearm accidentally discharged, the defendant was found guilty of involuntary manslaughter. *Id.* at 344-

347. On appeal, the defendant contended, in part, that the evidence was insufficient to prove she was guilty of involuntary manslaughter where she acted in self-defense and alternatively, where the shooting was only an accident. *Id.* at 349. However, because *Hoover* did not address the issue of intent that this case presents, we find the case inapposite. See *People v. Moore*, 358 Ill. App. 3d 683, 688 (2005) (finding *Hoover* "not instructive" where it did not "address whether the evidence was sufficient to establish the mental states of intent or knowledge," as the case on appeal presented). Consequently, the State sufficiently proved defendant guilty of first-degree murder.

¶ 56                                     B. Pretrial *Lynch* Motion

¶ 57    Defendant next contends that the trial court erred in barring evidence of Thompson, Craig, Edward and Berry's violent character, which would have supported his version of the events in which those individuals surrounded and threatened him, causing him to brandish and wave the shotgun in self-defense.

¶ 58    Generally, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Ill. R. Evid. 404(a) (eff. Jan. 1, 2011). There are some exceptions, however. See Ill. Rs. Evid. 404, 405 (eff. Jan. 1, 2011). Relevant here is the *Lynch* exception. Pursuant to *Lynch*, 104 Ill. 2d at 199-200, when the defendant raises the theory of self-defense, evidence of the victim's aggressive and violent character is relevant to (1) show that "the defendant's knowledge of the victim's violent tendencies" affected "his perceptions of and reactions to the victim's behavior" or (2) "support the defendant's version of the facts where there are conflicting accounts of what happened." See also Ill. R. Evid. 404(a)(2) (eff. Jan. 1, 2011) (a criminal defendant may introduce—subject to certain limitations in sex crime cases—character evidence of the victim); Ill. R. Evid. 405(b)(2) (eff. Jan. 1, 2011) (in a criminal homicide or battery case when the defendant raises self-defense and "there

is conflicting evidence as to whether the alleged victim was the aggressor, proof may also be made of specific instances of the alleged victim's prior violent conduct").

¶ 59    Under *Lynch*, character evidence serves two distinct purposes. The first purpose is to show the defendant's awareness of the victim's character and how that knowledge affected his perception of, and reaction to, the victim's conduct. *Lynch*, 104 Ill. 2d at 200. "[U]nder the first approach, the evidence is relevant only if the defendant knew of the victim's violent acts." *Figueroa*, 381 Ill. App. 3d at 841. The second purpose is to corroborate the defendant's version of events when his version conflicts with other accounts of what happened. *Lynch*, 104 Ill. 2d at 200. "Under the second approach, the defendant's knowledge is irrelevant, but there must be conflicting accounts of what occurred in order for the evidence to be admissible." *Figueroa*, 381 Ill. App. 3d at 841. Even if the character evidence is admissible under either of the two prongs of *Lynch*, such evidence may be excluded where its probative value substantially outweighs the danger of unfair prejudice, the risk of confusing or misleading the jury, or raises concerns about undue delays or the presenting of cumulative evidence. Ill. R. Evid. 403 (eff. Jan. 1, 2011); *People v. Martinez*, 2019 IL App (2d) 170793, ¶ 79 (recognizing that "Rule 403 functions under the evidence rules as the final threshold for admissibility; evidence otherwise admissible under the rules must meet its criteria").

¶ 60    Although defendant argues we should review this issue *de novo*, evidentiary rulings fall within the sound discretion of the trial court, and we will not reverse such rulings unless the court abuses that discretion. *People v. Reid*, 179 Ill. 2d 297, 313 (1997). An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the court. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 61                          1. Character Evidence of Thompson

¶ 62 Concerning the character evidence of Thompson—the victim in this case—defendant sought to introduce evidence that Thompson punched a man in the mouth in October 2006 and the police arrested him for the incident. In denying defendant's request to present this evidence, the trial court found the act too remote in time and that the act did not involve anyone related to his case. The trial court may properly consider the temporal remoteness of a violent act in determining whether to allow that evidence in under *Lynch*. *People v. Barnes*, 2017 IL App (1st) 143902, ¶ 49. The court may also properly consider the context of the violent act in question. See *People v. Ware*, 180 Ill. App. 3d 921, 928 (1988). Here, the court's two rationales for rejecting defendant's request to introduce evidence that Thompson had previously been arrested for punching a man in the mouth were proper considerations. Moreover, we note that, at trial, Veronica, Thompson's mother, testified that he was 21 years old on the night he was killed, which meant he was either 16 or 17 years old when he punched the man in October 2006. There is undoubtedly a difference in someone's behavior at 16 or 17 years old as a juvenile than at 21 years old as an adult (see *Graham v. Florida*, 560 U.S. 48, 68 (2010)), further buttressing the temporal remoteness of the punching incident. *See People v. Gumila*, 2012 IL App (2d) 110761, ¶ 56 (observing that we may affirm the trial court's ruling "on any basis appearing in the record, regardless of whether it was relied on by the trial court"). In light of these facts, we cannot say that the court's ruling was arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the court. Consequently, the trial court did not abuse its discretion in denying defendant's request to introduce the character evidence of Thompson.

¶ 63                          2. Character Evidence of Craig, Edward and Berry

¶ 64 Concerning the character evidence of Michael Craig, Edward Bibbs, Jr., and Shensky Berry, defendant sought to introduce copious amounts of evidence that these three men had acted

violently several times in their lives. In denying defendant's request to present this evidence, the trial court primarily found that none of the men were victims in the case and therefore *Lynch* did not apply.

¶ 65    As noted, defendant attempted to introduce the character evidence of these three men pursuant to *Lynch* and Illinois Rules of Evidence 404(a)(2) and 405(b)(2) (eff. Jan. 1, 2011). Initially, we note that, by clear their language, Rule 404(a)(2) and Rule 405(b)(2) only refer to a victim. See *id.* In *Lynch*, 104 Ill. 2d at 198, the defendant's son took the vehicle of Ernest Bell without permission and wrecked it. The cost to repair the vehicle was more than what the defendant could afford, which caused friction between him and Bell and resulted in Bell threatening the defendant's son. *Id.* One day, the defendant observed Bell's vehicle outside his son's residence. *Id.* The defendant obtained a firearm and intended to bring it to his son for protection. *Id.* When the defendant arrived at his son's residence, Bell was there with a friend, Lester Howard. *Id.* Ultimately, during the encounter, the defendant shot and killed Howard and claimed self-defense. *Id.* at 198-99. During the defendant's trial, defense counsel attempted to cross-examine Bell about Howard's prior battery convictions, but the trial court sustained the State's objection to the line of questioning. *Id.* at 199. The issue of whether that line of questioning was proper reached our supreme court, who held "that when the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor, and the defendant may show it by appropriate evidence, regardless of when he learned of it" and more specifically, in the two scenarios we have already discussed. *Id.* at 200.

¶ 66    Since *Lynch*, our supreme court has mentioned the decision seven times. See *People v. Nelson*, 2017 IL 120198, ¶ 21; *People v. Morgan*, 197 Ill. 2d 404, 454-58 (2001); *People v. Blue*, 205 Ill. 2d 1, 19 (2001); *People v. Sanchez*, 131 Ill. 2d 417, 425 (1989), *abrogated by People v.*

*Vincent*, 226 Ill. 2d 1 (2007); *People v. Gorney*, 107 Ill. 2d 53, 60 (1985); *People v. Hoffer*, 106 Ill. 2d 186, 196 (1985) *overruled by People v. Wright*, 111 Ill. 2d 18 (1986); *People v. Barnard*, 104 Ill. 2d 218, 239 (1984) (Simon, J., dissenting). However, beyond Justice Simon's dissent in *Barnard*, our supreme court has only discussed *Lynch* in more than mere passing twice.

¶ 67    In *Morgan*, 197 Ill. 2d at 452-58, the court discussed *Lynch* and whether the trial court erred in excluding evidence of the prior violent conduct of the defendant's grandparents, who he was convicted of murdering. In *Blue*, 205 Ill. 2d at 10-12, the court discussed *Lynch* and whether the trial court erred by preventing the defendant from cross-examining multiple State witnesses about their gang affiliation in a case where the defendant claimed he shot and killed his victim based on a gang dispute. However, the court noted that *Lynch* was inapplicable to the issue on appeal because the defendant sought to use the gang evidence "to expose the witnesses' potential bias against the defendant," *i.e.*, being in a rival gang, "not to show [the victim's] character." *Id.* at 19. In light of our supreme court's past discussions of *Lynch*, it is clear that the court has never expanded *Lynch* to cover situations involving nonvictims.

¶ 68    This court, however, has discussed whether *Lynch* could be expanded to cover situations involving nonvictims. In *Figueroa*, 381 Ill. App. 3d at 830-832, the defendant shot and killed an innocent bystander while he was being chased in his own vehicle by two other vehicles being driven by rival gang members. The defendant claimed he was acting in self-defense and requested the ability to present evidence about the violent character of the two rival gang members in order to explain why he fired his weapon. *Id.* at 831-32. The trial court did not allow him to do so unless he himself testified at trial, which he chose not to do. *Id.* On appeal, the defendant relied on *Lynch* and argued that the trial court erred by barring the introduction of the character evidence of the two rival gang members. *Id.* at 840. Although the appellate court found various reasons why the

character evidence was inadmissible, one such rationale was that the defendant had attempted to introduce character evidence of individuals who were "at the scene but not his victims." *Id.* at 843. The court observed that the defendant had not been charged with murder of these two men but rather of the innocent bystander. *Id.* The court concluded that "*Lynch* cannot apply here because 'its predicate is missing': [The rival gang members] were not defendant's victims." *Id.* Consequently, the court would not "extend *Lynch* in this case to cover" the rival gang members. *Id.*

¶ 69    Despite the lack of supreme court precedent, the presence of *Figueroa* and the clear language of Illinois Rules of Evidence 404(a)(2) and 405(b)(2)—the two rules of evidence he claimed the evidence was admissible under—defendant argues that the presentation of *Lynch* material is not limited solely to victims, where the defendant claims he acted in self-defense against a group of individuals and one of them happened to become the victim. In support of this proposition, defendant highlights *People v. Damnitz*, 269 Ill. App. 3d 51 (1994) and *People v. Robinson*, 163 Ill. App. 3d 754 (1987).

¶ 70    In *Robinson*, 163 Ill. App. 3d at 757, the defendant was charged with murder in the shooting death of Homer Davis. The defendant claimed that, during a confrontation with Davis, one of Davis' friends pulled out a shotgun from underneath his coat. *Id.* at 759. The defendant asserted that, in self-defense, he reached for the firearm, but it fell to the ground, accidentally discharged and fatally struck Davis. *Id.* Ultimately, a jury found defendant guilty of murder. *Id.* at 756. On appeal, the appellate court held that the defendant should have been allowed to introduce evidence of the prior acts of violence against him by Davis—the victim—in order to show his state of mind when he acted in self-defense against Davis' friend. *Id.* at 774.

¶ 71   In the present case, in contrast to *Robinson*, defendant sought to introduce the character evidence of Craig, Edward and Berry, none of whom were his victim. We acknowledge that, in *Robinson*, the appellate court favorably cited cases from foreign jurisdictions, where courts allowed the character evidence of third persons when those third persons were acting together with the victim. See *id.* at 773-74. However, the *Robinson* court's discussion of these cases was not essential to the outcome of the case nor an issue briefed by the parties, as the issue briefed was about the character evidence of the victim, *not a third party*. As such, the discussion in *Robinson* was merely *obiter dicta*, and it was not entitled to receive any weight by an inferior court. See *People v. Williams*, 204 Ill. 2d 191, 206 (2003).

¶ 72   In *Damnitz*, 269 Ill. App. 3d at 53, as Francisco Vargas was driving, he heard something hit his vehicle. When he exited his vehicle, he observed the defendant standing nearby, so Vargas chased after the defendant, ultimately hitting him with a stick and knocking him to the ground. *Id.* A short time later, the defendant shot Vargas. *Id.* The defendant sought to present evidence that members of the Spanish Cobras street gang had firebombed his house and shot at him previously. *Id.* The trial court only allowed the defendant to present evidence in which he could prove Vargas had been involved and required him to make an offer of proof concerning the testimony of each witness before that witness testified. *Id.* Ultimately, the court allowed defendant to present evidence of an incident where Vargas, who was with members of the Spanish Cobras, threatened to beat him up and evidence of an incident where Vargas and another person tried to start a fight with him on the street, but not the firebombing or shooting incident. *Id.* Although the defendant had been charged with attempted murder, among other charges, a jury convicted him of aggravated battery and armed violence. *Id.*

¶ 73     On appeal, the appellate court observed that there was some evidence that Vargas was either a Spanish Cobra himself or at least the defendant reasonably believed he was one. *Id.* at 59. The court noted that, when a defendant raised self-defense, he had the right to present evidence regarding his state of mind to show that he reasonably believed that, to protect himself, he needed to use the type of force he used. *Id.* Although the evidence that Spanish Cobra gang members had firebombed the defendant's house and shot at him previously did not involve Vargas himself, the court found the evidence was "relevant, as it helps [the] defendant establish 'the extent of his apparent danger, and the motive influencing him' [citation] when he shot Vargas, by showing that [the] defendant reasonably believed Cobras were willing to use deadly force against him." *Id.* Consequently, the appellate court concluded that the trial court erred by preventing the defendant from presenting evidence that the Spanish Cobras firebombed his house and shot at him previously.

¶ 74     However, despite the analysis in *Damnitz*, it never once cited *Lynch* and, indeed, the evidence improperly precluded from evidence were acts of violence that the defendant himself had experienced firsthand at the expense of relevant third parties, which were relevant to show his state of mind, knowledge or motive at the time of the shooting. See Ill. R. Evid. 404(b) (stating that evidence of other crimes, wrongs or acts are "not admissible to prove the character of a person in order to show action in conformity therewith" but "[s]uch evidence may also be admissible for other purposes, such as proof of motive *** [or] knowledge"). Conversely, in this case, as stated explicitly in defendant's pretrial *Lynch* motion, he sought to introduce essentially all of the proffered evidence of the violent character of Craig, Edward and Berry under the second prong of *Lynch*, which does not involve a defendant's knowledge of the violent character of another. See also Ill. R. Evid. 404(a)(2) (eff. Jan. 1, 2011) (a criminal defendant may introduce—subject to certain limitations in sex crime cases—character evidence of the victim); Ill. R. Evid. 405(b)(2)

(eff. Jan. 1, 2011) (in a criminal homicide or battery case when the defendant raises self-defense and "there is conflicting evidence as to whether the alleged victim was the aggressor, proof may also be made of specific instances of the alleged victim's prior violent conduct").

¶ 75    As previously noted, in defendant's pretrial motion to admit *Lynch* material, he relied on *Lynch* and Illinois Rules of Evidence 404(a)(2) and 405(b)(2) (eff. Jan. 1, 2011). Where our supreme court has never expanded *Lynch* to cover nonvictims and this court has explicitly rejected an attempt by a defendant to expand *Lynch* to nonvictims (see *Figueroa*, 381 Ill. App. 3d at 843) combined with the fact that Illinois Rules of Evidence 404(a)(2) and 405(b)(2) only involve victims, the trial court's ruling to bar the character evidence of Craig, Edward and Berry was well-grounded in law. Furthermore, because the *Robinson* court's discussion of character evidence and third parties was *obiter dicta*, it was not entitled to receive any weight by an inferior court. See *Williams*, 204 Ill. 2d at 206. And *Damnitz* was not even cited in the trial court by defendant. As such, we cannot say the trial court's ruling was arbitrary, fanciful, unreasonable, or that no reasonable person would take the view adopted by the court. *Illgen*, 145 Ill. 2d at 364. Consequently, the trial court did not abuse its discretion in denying defendant's request to introduce evidence of the violent character of Craig, Edward and Berry.

¶ 76                              C. Excessive Sentence

¶ 77    Defendant next contends that his 65-year sentence was excessive where the trial court improperly dismissed substantial mitigating evidence, improperly relied on its own personal experiences in sentencing him and misstated the evidence from trial.

¶ 78    At the outset, we note that defendant did not object to any of the issues he now raises on appeal during his sentencing hearing, and the record on appeal only contains the cover sheet for his motion to reconsider his sentence. As such, relying on *People v. Hillier*, 237 Ill. 2d 539 (2010),

the State contends that defendant forfeited this issue by failing to contemporaneously object or include it in his postsentencing motion. "It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *Id.* at 544. Defendant, meanwhile, cites to the trial court's hearing on his motion to reconsider sentence and argues that his excessive sentencing claim of error is fully preserved.

¶ 79    Defendant's lack of an objection did not result in a forfeiture of his excessive sentencing claim on appeal because, despite his lack of an objection, it is clear that he raised such a claim in his motion to reduce sentence based on the trial court's comments in denying the motion. See *People v. Williams*, 2019 IL App (1st) 173131, ¶ 18. Furthermore, although the court's comments indicated that defendant raised an excessive sentencing claim in light of his "background" and "the nature and his participation in the offense," his failure to raise the exact same arguments he now raises on appeal does not result in a forfeiture of his excessive sentencing claim. See *People v. Valadovinos*, 2014 IL App (1st) 130076, ¶ 51 ("Although [the postsentencing] motion did not explicitly raise the issue of improper aggravating evidence, the motion did touch on the issue of an unfair and excessive sentence, and therefore we find that the issue has been preserved for appeal."). Consequently, defendant preserved his excessive sentencing claim.

¶ 80    The Illinois Constitution requires trial courts to impose sentences according to the seriousness of the offense and with the objective of restoring the defendant to useful citizenship (Ill. Const. 1970, art. I, § 11), or, in other words, to consider the defendant's rehabilitative potential. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. But the most important factor the court must consider when imposing a sentence is the serious of the offense. *People v. Williams*, 2017 IL App (1st) 150795, ¶ 44. In Illinois, the legislature prescribes the permissible sentencing ranges for criminal offenses, and the trial courts impose a sentence within the legislatively prescribed range.

*People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16. In determining the proper sentence, trial courts are given broad discretionary powers (*People v. Alexander*, 239 Ill. 2d 205, 212 (2010)), and a sentence will not be reversed absent an abuse of that discretion. *People v. Geiger*, 2012 IL 113181, ¶ 27.

¶ 81     Reviewing courts provide such deference to the trial court because it had "the opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). "We presume a trial court evaluates the relevant factors in mitigation before it, and that presumption cannot be overcome without affirmative evidence of the sentencing court's failure to do so." *Williams*, 2017 IL App (1st) 150795, ¶ 44. "Nothing requires the trial court set forth every reason or specify the weight it gave to each factor when determining the sentence." *Id.* When a sentence falls within the statutory range, it is presumed to be proper (*Knox*, 2014 IL App (1st) 120349, ¶ 46), and may only be "deemed excessive and the result of an abuse of discretion" where it is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210.

¶ 82     In this case, the jury found defendant guilty of first-degree murder and in doing so also found that, during the commission of the offense, he personally discharged a firearm that proximately caused death. As such, under the facts of this case, the sentencing range for defendant's first-degree murder itself was between 20 and 60 years' imprisonment. 730 ILCS 5/5-4.5-20(a) (West 2010). Because the jury made the additional finding that defendant personally discharged a firearm that proximately caused death, the court was required to add a 25-year enhancement to his sentence. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2010). This, in turn, provided the court a sentencing range of between 45 and 85 years' imprisonment. The court sentenced

defendant to 65 years' imprisonment, right in the middle of the applicable sentencing, meaning that the sentence was presumptively proper. *Knox*, 2014 IL App (1st) 120349, ¶ 46. In addition, when sentencing defendant, the court's comments clearly indicate that it took into consideration, among various other factors, the seriousness of the offense and defendant's rehabilitative potential and balanced these two critical factors. See Ill. Const. 1970, art. I, § 11.

¶ 83 Despite this presumptively proper sentence, defendant claims that the trial court improperly rejected significant mitigating evidence, including the letters of support from his family and friends, the evidence of his various affirmative defenses, his apology to Thompson's family, his learning disability and the evidence of his attempts to improve himself in jail. Nothing in our review of the record indicates that the court flatly refused to consider this evidence. In fact, the opposite is true. The court clearly read and listened to defense counsel's recitation of the character letters because, in discussing defendant's sentence, it made multiple references to the letters, but ultimately found certain assertions in those letters contradicted by other evidence. The court was entitled to give defendant's character letters any amount of weight it wanted, and we will not re-weigh the value of those letters on appeal. See *Alexander*, 239 Ill. 2d at 214-15.

¶ 84 Additionally, although defendant claims there was evidence of various affirmative defenses, the jury clearly rejected any notion that defendant acted to defend himself when it found him guilty of first-degree murder. The court does not have to give credence to defendant's claims that he acted in self-defense, especially when the jury completely rejected those defenses. Regarding defendant's claim that the court rejected his apology to Thompson's family, the court merely noted that, during the sentencing hearing, was the first time defendant ever took responsibility for his actions. The court acknowledged defendant's apology and gave that statement whatever weight it believed it deserved. Again, we will not re-weigh mitigating evidence

on appeal. See *Alexander*, 239 Ill. 2d at 214-15. The same is true with defendant's learning disability. The court acknowledged it, but merely commented that many people with learning disabilities do not end up committing first-degree murder. Although defendant presented mitigating evidence, including some evidence that he was also trying to better himself in jail, the court was not required to give greater weight to this evidence and other mitigating factors than to the seriousness of the offense. *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123.

¶ 85    Defendant further argues that the trial court improperly relied on its own personal experiences when imposing his sentence, in particular when discussing the photographs of Thompson's gunshot wound. It is improper for the trial court to rely upon matters outside the record, namely, its own personal career experience, when sentencing a defendant. *People v. Patterson*, 2017 IL App (3d) 150062, ¶ 34. But we must presume that the court considered only competent and relevant evidence in determining a sentence. *People v. Ashford*, 168 Ill. 2d 494, 508 (1995). Although the court undoubtedly discussed its military background and experience as a civil litigator when referencing Thompson's gunshot wound, there is nothing in the record to support defendant's argument that the court's comments on its extrajudicial experience influenced defendant's sentence. See *id.*; *People v. Whitney*, 297 Ill. App. 3d 965, 971 (1998).

¶ 86    The present case is unlike *People v. Dameron*, 196 Ill. 2d 156 (2001) and *People v. Henry*, 254 Ill. App. 3d 899 (1993), which defendant relies upon for support. In *Dameron*, 196 Ill. 2d at 162, 172, 177-78, the trial court sentenced the defendant to death, and in doing so, relied extensively on two outside sources: a social science book and a transcript of sentencing comments made by the trial judge's father in a 1966 murder trial. Our supreme court reversed the defendant's death sentence and remanded for resentencing, holding that the trial court improperly "sought alternative avenues of information in his effort to reach the correct result." *Id.* at 179. In *Henry*,

254 Ill. App. 3d at 904, after the defendant was convicted of armed robbery and aggravated battery, the trial court stated: " 'This is really a disgusting crime. And that's why you are given this amount of time.' " The appellate court remanded for resentencing and found that, "[b]ased upon the clarity of the trial court's statement, we cannot say that the court did not rely upon its own opinion of the crime when it sentenced defendant." *Id.* at 905. Unlike either of these two cases, there is no evidence in the record that the trial court relied on its extrajudicial experience when sentencing defendant. Consequently, *Dameron* and *Henry* are inapposite.

¶ 87     Lastly, defendant posits that the trial court misstated facts during his sentencing hearing, namely when the court stated that defendant had no defense that the shooting was an accident or done in self-defense, but rather he was being a " 'tough guy.' " This argument is simply a rehashing of his prior argument where he claimed the court rejected the mitigating evidence of self-defense. The court does not have to give credence to defendant's claims that he acted in self-defense or the shooting was an accident, especially when the jury completely rejected those defenses. As such, the court did not misstate facts.

¶ 88     In sum, the trial court sentenced defendant to a presumptively proper sentence within the legislatively prescribed sentencing range while focusing on the seriousness of the offense and defendant's rehabilitative potential, among other factors. And in doing so, the court did not improperly reject substantial mitigating evidence, did not improperly rely on its own personal experiences in sentencing defendant and did not misstate evidence from trial. Consequently, defendant's 65-year sentence for first-degree murder was not excessive.

¶ 89                                      D. Mittimus

¶ 90     Defendant lastly contends that his mittimus must be corrected to reflect that he was convicted and sentenced on only one count of first-degree murder and to reflect the statutorily

authorized term of three years of mandatory supervised release. Defendant's mittimus shows first-degree murder convictions on five counts (Counts I through V) and concurrent sentences on each of those counts for 65 years' imprisonment. The mittimus further orders defendant to serve three years to life of mandatory supervised release. Defendant did not raise this sentencing issue in his motion to reconsider the sentence, but we may review the issue as second-prong plain error. See *People v. Coats*, 2018 IL 121926, ¶ 10.

¶ 91     First, with regard to defendant's five convictions for first-degree murder, when a defendant has murdered one victim, there can only be one conviction for such an act under the one-act, one-crime rule. See *People v. Pitsonbarger*, 142 Ill. 2d 353, 377 (1990) ("A defendant cannot be convicted of more than one murder arising out of the same physical act."). When a defendant has been convicted of multiple murders arising out of the same act, we must vacate the less culpable convictions. *Id.* In the present case, both defendant and the State agree that only Count V should stand, as that is the offense with the most culpable mental state given it alleged that defendant intentionally or knowingly shot and killed Thompson while armed with a firearm, and during the commission of the offense, he personally discharged a firearm that proximately caused death. We may amend the mittimus without remanding the matter to the trial court. *People v. Profit*, 2021 IL App (1st) 170744, ¶ 48; see also Ill. S. Ct. R. 615 (b)(1). Therefore, we vacate defendant's convictions on Counts I through IV and amend the mittimus to reflect only one conviction for first-degree murder on Count V.

¶ 92     Second, with regard to defendant's three years to life of mandatory supervised release, both parties also agree that defendant could only receive three years of mandatory supervised release for his offense under the sentencing statute for first-degree murder. See 730 ILCS 5/5-4.5-20(l) (West 2010). As with amending the mittimus to reflect only one conviction for first-degree murder,

"we may amend the mittimus to reflect the proper MSR term" without remanding the matter to the trial court. *People v. Foster*, 2021 IL App (2d) 190116, ¶ 18; see also Ill. S. Ct. R. 615 (b)(1). Therefore, we amend defendant's mittimus to reflect a term of three years' mandatory supervised release.

¶ 93                                  III. CONCLUSION

¶ 94    For the foregoing reasons, we affirm defendant's conviction and sentence, but amend his mittimus.

¶ 95    Affirmed as modified.